300 P.2d 482

Henry W. MATHIS, Plaintiff-Appellee,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant-Appellant.

No. 6068.

Supreme Court of New Mexico.

Aug. 10, 1956.

B. G. Johnson, Edwin L. Mechem, Albuquerque, for appellant.

Joseph L. Smith, Henry A. Kiker, Jr., and P. H. Dunleavy, Albuquerque, for appellee.

LUJAN, Justice.

This is a suit for damages brought under the provisions of the Federal Employers' Liability Act, § 1 et seq., as amended, 45 U.S.C.A. § 51 et seq., and the appeal is taken by defendant from the judgment entered upon the verdict of a jury awarding damages to the plaintiff in the sum of $43,000, for injuries incurred by him while in the discharge of his duties as switchman.

On this appeal defendant attacks the verdict and judgment solely upon the ground that it is excessive and shows the result of passion and prejudice on the part of the jury.

The facts as disclosed by the record are substantially as follows: On July 21, 1953, the appellee was seriously injured while attempting to throw on a switch in appellant's railroad yard, which was not in good operating condition, and as a result thereof he was compelled to undergo surgery. Immediately upon trying to throw on the switch appellee felt a sharp pain in his left groin. He did not, at that moment, believe it to be serious so he continued to work until midafternoon of that day at which time he quit work on account of pain. The next day appellee went to see appellant's doctor who told him that he was ruptured but that he would not be able to treat him as he was leaving on his vacation, but told him to apply hot pads which would relieve him of pain. The pain did not subside, on the contrary his left testicle and leg began to swell and the pain increased. On July 27, 1953, he went to appellant's hospital in Albuquerque where he was administered opiates to relieve the pain and placed in ice packs to bring down the swelling. He remained in the hospital until September 7th at which time he was released and told to go home and stay there for two weeks, but before the two weeks were over he returned to the hospital as he could not stand the pain any longer. On September 15th he was again admitted to the hospital and again placed in ice packs

to bring down the swelling. During all of this time he was administered opiates to relieve the pain. On September 30th the epididymis was removed from his left testicle. On October 15th he was operated on for hernia. On October 23rd he was released and allowed to return to his home in Belen. During the early part of December 1953, his right testicle and leg began to swell which caused him excruciating pain. On December 9th he was again admitted to the hospital for treatment. On December 11th the epididymis from his right testicle was removed. Sterility resulted from the two operations of his testicles. On June 7, 1954, appellee was again hospitalized after having been placed in traction for severe back pain which had troubled him since his release from the hospital in January 1954.

The plaintiff testified in his own behalf and stated as follows:

\*　　\*　　\*　　\*　　\*　　\*

"Q. And then, Mr. Mathis, after that how did you feel, did you improve or remain the same—did you have any pain? A. There was pain all the time and after the swelling had all started in here, it was severe and at times I'm telling you, I wished I was dead.

"Q. Did you lay down in bed? A. Yes, sir, I was packed with ice bags from here.

"Q. Did you lay on your stomach at times with your feet up, or were you straight up in bed? A. No, I was laying on my back most of the time—until I would get to hurting so bad I had to change positions and I'd kinda turn over on my side, then take my hand and hold these ice packs."

\*　　\*　　\*　　\*　　\*　　\*

"Q. Then did you get better or did you have to go back to the hospital? A. Well, in December I got worse—my right testicle went to swelling and hurting me an awful lot and so I told my wife 'let's go back up there and see what they say,' and I came back to the hospital in December.

\*　　\*　　\*　　\*　　\*　　\*

"Q. That was in June of fifty four? A. Yes, sir. And, so I called Dr. Levins and he came out there and he examined me and he said 'you had better go to the hospital.' And Mr. Clevenger, a friend of mine there in Belen got me and my wife and brought me to the hospital, brought me up here and they put me in bed and they called the doctor there and I don't know who it was now that came in to see me that afternoon—that was on a Sunday afternoon, and they gave me a shot—well Dr. Levins gave me a shot there at Belen, I was suffering that bad—and they gave me another shot when they

put me to bed in Albuquerque and on Monday—I'm trying to think of the doctor's name, that bone specialist.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Where does your back bother you? A. From right along there to right along there.

"Q. It starts right along the belt line and up—to up along the shoulder blade? A. Yes.

"Q. Is that a constant pain? A. Yes, sir, and in my hip is a constant pain.

"Q. How about sitting still—I notice you moving around in the chair. A. I can't sit still very long.

"Q. How about walking? A. Well, when I first start out to walk—it hurts me an awful lot, but after I kinda get it limbered up a little bit, it doesn't hurt as bad as usual as when I first start out, but it hurts me all of the time in there to a certain extent.

"Q. Would you be able to hold down a job, even at bleeding cars, if you were not working with men that knew you for twenty or twenty-five years and did a great part of your work? A. It would be an awful task to do, it.

\*　　\*　　\*　　\*　　\*　　\*

"Q. How about your general condition—are you normal, are your nerves okay? A. No, sir, I'm awful nervous and shaking—shake all through my body at all times, practically at all times.

"Q. Is it something that's with you all the time, is that right? A. Yes, sir."

Mr. Charles M. Lee, testified as follows:

\*　　\*　　\*　　\*　　\*　　\*

"Q. Under what circumstances did you meet Henry W. Mathis? A. I met Mr. Mathis on July the 27th, on his entering the hospital, and entering my room, when he entered my room.

"Q. Oh, you were placed in the same room? A. Yes, sir, we were in the same room.

"Q. What year was that, '53? A. 1953.

\*　　\*　　\*　　\*　　\*　　\*

"Q. And what was Mr. Mathis' condition, as you observed it, on July the 27th, 1953? A. He was suffering, and seemed to be in great pain.

"Q. What do you mean by that? A. Well, he was moaning, and there was perspiration running off of him, and he said he had hurt himself, and I asked him about his injury, and he said he had ruptured himself.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Did you examine any part of his body? A. I did, but not on that date. I did a few days after that. I

didn't have an opportunity that day, because he was laying prone, face down, with his hands underneath his stomach, or thereabouts.

"Q. And you state that he was moaning, or groaning. Now, what did you mean by that? A. Like he was in pain, or in agony.

"Q. What was his facial expression, or his general appearance? A. His facial expression was drawn, and at times, he shed tears perspiration breaking out on his face like he was under terrible strain, or stress.

"Q. How long did he remain in that condition, as you observed him, Mr. Lee? A. I don't remember the exact date; the word would be for several days.

"Q. That is quite O.K. You don't remember the exact number of days, you stated? A. I was in the room with him July the 27th until—I am going to have to study a minute, I am going to have to think back—September 7th, continually over those periods. He was permitted, as I remember, about September 7th, to leave the hospital for a few days, but he told me when he left that he was under pain, and he showed me a swollen condition.

"Q. Now, you stated earlier in your testimony that you saw his body. When, if you recall, did you physically examine, or see Mr. Mathis' body? A. I can't give you the exact date, but the time was about 7:00 P.M. It was two or three days after he entered the hospital. I did examine his body.

"Q. And what did you see? A. I seen his swollen condition.

"Q. And what part of his body was swollen? A. His testicle was swollen that big, if you can describe that size, greatly swollen.

"Q. That is as large as your two hands together? A. Together, like that, yes, sir, and the cord from the testicle to the prostate gland, I would say, was almost as big as a water hose, narrow water hose, and was all red and inflamed, and he was in great pain and agony. I asked him—

"Q. (Interrupting) Why do you state that he was in pain, or agony, Mr. Lee? A. Well, a man that is his age, that is holding himself like that, and crying, perspiration running all over him, and you standing over him mopping him with a wet cloth, ice cloth—

"Q. Did you do that? A. Yes, sir, I did, and in the meantime, I re-examined his ruptured condition, that is, not the ruptured condition, because I can't

say that was ruptured, I don't know what it is, but what caused that.

"Q. Do you mean the swelling? A. The swelling in the testicle and in the cord.

"Q. Well, now during this period of time, was he visited by any nurses or orderlies? A. Yes, sir; yes, sir.

"Q. What, if anything, was done for him, in your presence? A. He was given several hypos.

"Q. And what, if any, effect did the medicines have on him? A. When he was in great pain, it was just so much water, because it had no effect on him whatsoever, apparently, from what I could tell, because his pain didn't lessen. It was day and it was night, all day.

*     *     *     *     *     *

"Q. What was his condition on the following day—A. His condition—

"Q. (Continuing)—as you saw it? A. He lay in bed all day, stayed in bed. He was instructed by his doctor to remain in bed and not go to the bathroom. His feet remained elevated, and I again had an opportunity to observe his condition, and it was greatly swollen, the testicle, and all, and inflamed, red, and he was still under—well, a moan, or groan, whatever you call it. He couldn't move. He couldn't turn over.

"Q. Well, did he make any sounds, or— A. Yes, sir, he did make signs like he was in great misery, or great pain.

"Q. How? A. A moaning, you would call it.

"Q. And I believe you mentioned something about his having cried on some occasions. When was that? A. Absolutely. Not—several occasions he has cried, tears running down his cheeks, try to draw himself up, hold himself.

"Q. Well, was he lying on his back in bed, or in what manner? A. The majority of the time, yes, but when he would go into this great pain, he couldn't be still. He would turn over on his left side and try to take the weight off that testicle.

"Q. What did you do on those occasions? A. I would bathe his face in cold water, just as cold as they had out there, ice water, and try to keep the perspiration mopped off his face, and at various times, they gave him hypos, on as close intervals as they are permitted to give a narcotic to a patient for suffering. He would call for hypos for relief. They would say, "We have give you all we can give you. You have taken the limit."

Doctor Jose A. Revis testified as follows:

"* * * Q. Do you think then, Doctor, that all this difficulty that he is having came from this particular strain on July twenty-third, nineteen and fifty-three? A. Of his lower body, yes.

"Q. Now, Doctor, with reference to the permanency of his condition you have reviewed the charts of the two operations, the epididyectomy I understand is a condition, if you will just look these over, the sterility, the phlebitis of the hip and leg, and the skin and the pain that he now complains of and the condition of his skin—you say all of those are permanent or temporary? A. They are permanent, very permanent.

"Q. And do you think its progressive? A. Yes, his condition will cause all of this to be progressive.

"Q. Now Doctor, do you think that he has had any pain from all of this combination of affairs since July twenty-third? A. Phlebitis is very well known to be a very painful condition because it damages the nerve which runs along the side of the blood supply and when a nerve is injured either by removing it's blood supply or by actual traumatic injury—injuring it by hitting it, it is very painful yes."

At the trial, some 26 months later, he was still suffering constant pain in his back and hips.

Doctor David G. Clark testified as follows:

"Q. Well, now, do you think, Doctor, in your experience in treating cases of this kind, that he suffered much pain as a result of this swelling, or what would you tell us about that, both in the testicles and the legs? A. Well, of course the man himself, states that he had pain and that is the reason for going to the Doctor in the first place. He did not, himself, notice any lump, but the doctors did, he just had continuous pain, and he has not effected me as being a particularly sensitive type of individual, and I see no reason to doubt that he did have considerable pain. Epididymitis itself is quite painful, and it is no fun to have.

"Q. Well, now, his condition as we see him here in the court room, the limp and the pain in the lower back and leg, is that painful? A. Yes, he is having some pain as he walks, and in time during which I have been taking care of him, he has developed more pain and fatigue in this extremity during the time that he works, and the only chance we have had to try him out really without work was during a vacation period when he did stay indoors too and rested a lot and he improved, but then when he went back to work it popped a little worse than before."

▬ The fact that a verdict appears to be excessive is not a ground for a mo-

.tion for a new trial. It is only when the excessive damages appear to have been given under the influence of passion or prejudice that a new trial may be granted for that reason. There is no standard fixed by law for measuring the value of human pain and suffering. In every case of personal injury a wide latitude is allowed for the exercise of the judgment of the jury, and, unless it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience, this court cannot substitute its judgment for that of the jury. See, Rivera v. Atchison, Topeka and Santa Fe Railway Company, 61 N.M. 314, 299 P.2d 1090.

In the present case, the amount awarded was fixed by the jury and approved by the trial court. We find nothing in the record before us tending to clearly show passion or prejudice as actuating in any respect the award made.

The denial of a motion for a new trial is assigned as error. A new trial is not a matter of right. Whether a new trial should be granted or denied is a matter resting within the sound discretion of the trial court, and this court will not intervene unless there has been a manifest abuse of such discretion. See, Adams v. Cox, 55 N.M. 444, 234 P.2d 1043. No abuse of discretion is shown herein. We conclude that the trial court did not err in denying the defendant's motion for a new trial.

The judgment will be affirmed.

It is so ordered.

COMPTON C. J., and SADLER and McGHEE, JJ., concur.

KIKER, J., not participating.