604 P.2d 823

Marcus L. GRAMMER,
Plaintiff-Appellee,

v.

KOHLHAAS TANK AND EQUIPMENT COMPANY, a corporation,
Defendant-Appellant.

No. 3652.

Court of Appeals of New Mexico.

Nov. 27, 1979.

Rehearing Denied Dec. 7, 1979.

Janet T. Santillanes, Eugene Klecan, Klecan & Roach, Albuquerque, for defendant-appellant.

O. R. Adams, Jr., David A. Grammer, Jr., Albuquerque, for plaintiff-appellee.

## OPINION

SUTIN, Judge.

This is a strict products liability case in which a compressor tank manufactured by defendant exploded below the automotive shop of Montgomery Wards and seriously injured plaintiff employed there as a mechanic. The jury returned a verdict for plaintiff and defendant appeals from the judgment rendered. We affirm.

### A. *Facts most favorable to plaintiff.*

Plaintiff was a mechanic who worked in the automotive shop of Montgomery Wards. On August 10, 1973, while at work, one of the three compressor tanks manufactured by defendant, while operating under pressure, exploded causing plaintiff serious injuries. The tank that exploded was delivered to Montgomery Wards in good condition in February, 1973 and was in operation about six months prior to the explosion. The normal life of the tank would approximate five years, although a replacement tank and others had been in operation 12 years.

The evidence is undisputed that the tank ruptured at a welded seam. The tank had a longitudinal seam and top seam, designated as a circumferential seam. The initial failure in the tank occurred on the longitudinal seam in the vicinity of 6 to 10 inches below the top weld. The explosion did not occur at the point of maximum stress. Metal, particularly steel, has a property called fatigue in which steel will carry a given stress for many applications until this fatigue process occurs to a sufficient degree that it will no longer carry that particular load even though the load or stress has never increased above a particular value.

Expert testimony established that, over the several months the tank was in use, the failure occurred as a result of fatigue, due to the fatigue of the weld during normal operating stress in the tank; that if the weld had been done properly, it would have been as strong as the parent metal. It would have carried a considerable overload. The fact that all of the failure occurred in the seam indicated that it was the weakness of the seam that caused the failure. The experts opinionated that the tank failed under normal working or operating conditions as the result of a faulty weld based on the fact that the weld seam simply came apart.

### B. *Defendant was not entitled to a directed verdict or judgment N.O.V.*

Defendant claims the trial court erred in denying its motion for a directed verdict and judgment N.O.V. "because the plaintiff did not prove that a defect existed; nor did plaintiff prove that any defect caused the accident."

It does not require citation of authority to support plaintiff's position that under the doctrine of strict products liability, defendant, the manufacturer of the tank that exploded, which tank was in defective condition, unreasonably dangerous to plaintiff, and without any change in the condition in which it was sold to Montgomery Wards, is liable for damages to plaintiff even though defendant exercised all possible care in the manufacture and sale of the tank.

We have carefully read 25 pages of defendant's argument on this subject matter. Nothing was found which shows insufficient evidence to submit to the jury factual questions of the presence of a defect and its proximate cause of the accident. Expert testimony was strong and effective to establish these facts. Apart from expert

testimony, defendant, by cross-examination of plaintiff, learned in mechanics and welding, established that the weld was defective from the top of the seam all the way down.

■ To establish an insufficiency in the evidence, defendant must set forth all testimony, facts and evidence, together with all reasonable inferences to be drawn therefrom, most favorable to plaintiff and disregard all conflicting evidence. This, defendant did not do. It has often been stated that motions based upon an insufficiency of the evidence lack favor on appeal unless defendant hews the mark to show a complete absence of evidence to sustain an issue of fact. This must be done before defendant can argue vociferously, as defendant did, that plaintiff cannot rely on res ipsa loquitur when this doctrine was absent from the case; that the primary method of proof by plaintiff was to show that no misuse occurred; that the mere happening of an accident is not proof of products liability, or that plaintiff is attempting to stretch the doctrine of strict liability far beyond its intended scope. Argument of this nature is valueless.

■ Defendant failed to destroy expert testimony wherein opinions focused on fatigue as the defect in the weld. The arguments made by way of logic, that the experts did not compute or analyze the strength of a weld of ⅓ penetration, ¼ penetration, or any variation from 100% penetration, together with other similar detailed technical disputations, might affect the weight of the expert's testimony. To answer each of the technical contentions made, would require this Court to sit in conference with physicists to seek a solution. We are not physiochemical physicists who can apply defendant's logic to the expert's opinion to decide whether the opinion was without foundation. Defendant's disputations are matters of argument to the jury, not to this Court. It is common knowledge that this Court will not weigh evidence. We determine whether plaintiff made a prima facie case. We hold that plaintiff did.

We say without hesitation that the experts' opinions, as well as that of plaintiff, created issues of fact for the jury on whether plaintiff proved the existence of a defect in the weld.

Defendant raised two additional sub-points: (1) the requisite proof of defect existing at the time the tank left the defendant manufacturer is missing and (2) it was error to allow the expert witness to judge the credibility of other witnesses. These sub-points do not deserve discussion.

C. *The court did not err in allowing testimony regarding A.S.M.E. Standards.*

One of plaintiff's experts was allowed to testify briefly as to requirements in the manufacture of the tank under the Standards of the American Society of Mechanical Engineers. This testimony, defendant argues, was extremely prejudicial. We disagree.

Defendant overlooked the prior testimony of Max A. Smith, vice-president and engineer of defendant. His deposition was read into evidence. The following questions and answers were read without objection:

Q. On these specifications that you just read, Mr. Smith, where did you get that information?

A. It is design criteria taken from A.S.M.E. code textbook for design of pressure vessels.

* * * * * *

Q. Data, documents and information relating to manufacture and specifications.

A. Yes. * * * This is a design data based upon A.S.M.E. code which would include, among other things, the design criteria *for this particular tank.* That's the heads *for the tank.* The elliptical heads, that's this one, and similar design criteria for the shell thickness *of the tank in question.*

* * * * * *

Q. * * * This book is entitled "Fogle's Number One Tank and Pressure Vessel Handbook for the New 1952 A.S.M.E. Code."

A. Yes, sir.

Q. And on the inside it's marked "1952 Edition."

A. Um-hum.

Q. *And is this still the book that you use in the manufacture?*

A. Yes.

Q. *It's still valid for the things it has in it?*

A. Yes. [Emphasis added.]

■■ Defendant's objections to the expert's testimony on A.S.M.E. Standards comes too late. Defendant relies on *Jasper v. Skyhook Corporation,* 89 N.M. 98, 547 P.2d 1140 (Ct.App.1976), reversed on other grounds, 90 N.M. 143, 560 P.2d 934 (1977). In *Jasper I,* this Court held that federal Occupational Safety and Health Act (O.S. H.A.) Regulations were not relevant and were inadmissible in evidence. Not so in the instant case where A.S.M.E. Standards were used in the manufacture of the tank in question.

The trial court did not err in allowing testimony regarding A.S.M.E. Standards.

D. *No error occurred in disclosure of defendant's insurance.*

During the course of the trial, the following questions were asked by plaintiff and answered by Vincent DiSylvester, a witness.

Q. By whom are you employed, Mr. DiSylvester?

A. Presently Denny's Restaurant in Las Cruces, New Mexico.

Q. And by whom were you employed in August of 1973?

\* \* \* \* \* \*

A. Hartford Insurance Group.

Q. And what was your job, Mr. DiSylvester?

A. Senior claims representative.

Q. And, Mr. DiSylvester, shortly after August 10th, 1973, did you have occasion to go examine a pressure tank that exploded under a hoist out at Montgomery Ward and Company?

A. Yes, I did.

\* \* \* \* \* \*

Q. Now, Kohlhaas Tank Company, and not Montgomery Ward was your insured, right?

A. Yes.

\* \* \* \* \* \*

Q. Who was your insured? In other words—

A. It was Kohlhaas Tank and Equipment.

Defendant objected to the admission of this testimony.

In chambers, before voir dire of the jury, the matter of plaintiff identifying DiSylvester as an employee of Hartford Insurance Group was a verbal war. The purpose of the identification was to show that Max Smith, vice-president and engineer of defendant, together with DiSylvester, examined the tank; that Smith told DiSylvester that he, Smith, thought the tank had ruptured because of a defective welding at the seam and that the testimony of DiSylvester would prove an admission by Smith and impeachment of his testimony.

In defendant's answers to interrogatories and Max Smith's deposition, both read to the jury, defendant and Smith stated that the cause of the rupture along the longitudinal seam was *misuse* and not defective welding at the seam. Smith and DiSylvester did meet at Montgomery Wards after the explosion. Smith did not recall any conversation relating to the cause of the accident. DiSylvester's testimony followed:

Q. Subsequent to the examination made by yourself and by Mr. Smith, did you have a discussion with Mr. Smith about the cause of the tank rupturing?

\* \* \* \* \* \*

A. \* \* \* [A]s we were leaving, Mr. Smith and I were discussing what might have been the cause, and we discussed either a weak seam or an improper seam.

\* \* \* \* \* \*

Q. What did Mr. Smith tell you that he thought about the cause of the rupture?

\* \* \* \* \* \*

A. Well, he had indicated that possibly it might have been a bad seam.

Q. Did he give you any reasons as to why he would like to get the tank to run tests on?

\* \* \* \* \* \*

A. Well, he said he had not seen anything like it, and would want to try to run some tests to see what caused it, so possibly it wouldn't happen again.

In cross-examination, when inquiry was made of DiSylvester, he answered:

A. Well, Mr. Smith, who was with me, made the statement, or said something like "It's obvious that it's the seam. It's obvious it broke at the seam."

\* \* \* \* \* \*

Q. But what caused the break at the seam couldn't be told as you were looking over this tank?

A. It would—we just knew it was an explosion of some sort.

\* \* \* \* \* \*

Q. \* \* \* [A]s I understand it, you prefaced it as far as Mr. Smith's language, he said that possibly it might have been a bad seam.

A. Well, he said possibly it might have been a bad weld, bad seam, could have been.

The tank explosion occurred on August 10, 1973. New Mexico Rules of Evidence became effective July 1, 1973. Rule 411 reads:

Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. *This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose*, such as proof of agency, ownership or control, or bias or prejudice of a witness. [Emphasis added.]

Rule 403 reads:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ..

Rule 411 stands for the proposition that the existence of a liability insurance policy is not admissible to show one's negligence or other wrongful conduct. But evidence of the existence of insurance may be shown for other purposes, *Charter v. Chleborad*, 551 F.2d 246 (8th Cir. 1977), and the exclusion of insurance coverage where relevant is reversible error. *Posttape Associates v. Eastman Kodak Co.*, 537 F.2d 751 (3rd Cir. 1976).

In fact, it has been held that references to insurance coverage made in the course of *identifying a statement* for purposes of impeachment did not violate Rule 411's prohibition against admitting evidence of insurance coverage in order to show wrongdoing. *Varlack v. SWC Caribbean, Inc.*, 550 F.2d 171 (3rd Cir. 1977). On the issue of whether insurance coverage is admissible to establish an agency relationship, see *Hunziker v. Scheidemantle*, 543 F.2d 489, 495, Note 10 (3rd Cir. 1976), and as bearing upon the credibility of a witness and the weight to be given to his testimony, see, *Theurer v. Holland Furnace Co.*, 124 F.2d 494 (10th Cir. 1941).

A review of the law on the admission in evidence of insurance coverage began over a third of a century ago with discussion of questions directed to jurors on voir dire examination in regard to their interest in insurance companies. *Olguin v. Thygesen*, 47 N.M. 377, 143 P.2d 585 (1943). *Olguin* points out that to suggest that jurors are without knowledge as to insurance coverage for those likely to be subjected to action for negligent conduct is fictitious. The Court said:

It must now be rather generally recognized that in suits of this character at least the large employer of labor usually carries liability insurance, *and that the insurance carrier in such cases is in fact*, if not strictly as a matter of law, *the real party in interest since it must pay any judgment recovered*. . . . [Emphasis added.] [Id. p. 384, 143 P.2d p. 589.]

This concept was carried forward in *Hale v. Furr's Incorporated*, 85 N.M. 246, 511

P.2d 572 (Ct.App.1973), Sutin J., Specially Concurring. Hartford Insurance Group was not only the real party in interest in fact, but it also assumed a fiduciary relationship with defendant. *Chavez v. Chenoweth*, 89 N.M. 423, 553 P.2d 703 (Ct.App. 1976). We have not, to date, reversed any case by reason of the admission in evidence of insurance coverage. But on two occasions, reversible error resulted where exclusion of insurance coverage occurred. *Selgado v. Commercial Warehouse Company*, 86 N.M. 633, 526 P.2d 430 (Ct.App.1974); *Mac Tyres, Inc. v. Vigil*, 92 N.M. 446, 589 P.2d 1037 (1979). See *Anderson v. Welsh*, 86 N.M. 767, 527 P.2d 1079 (Ct.App.1974).

*Mac Tyres, Inc.*, involved a plaintiff who lied to a representative of his employer's workmen's compensation carrier. The trial court disallowed testimony that the person to whom the lie was told was a representative of the insurance company. In reversing this case, authorities omitted, Justice McManus said:

> The trial court has a great deal of discretion in applying Rules 403 and 411. * * *
>
> * * * * * *
>
> * * * The trial court's ruling can only be held to be reversible error in the event of an abuse of that discretion.
>
> * * * In our opinion, the trial court abused its discretion by limiting Mac Tyers' presentation of impeachment evidence.
>
> The right to impeach a witness is basic to a fair trial. * * * [Id. 589 P.2d 1039.]

 The rule in New Mexico on disclosure of insurance coverage may be stated as follows:

1. Evidence that a person was or was not insured against liability is *not* admissible upon the issue whether he acted negligently or otherwise wrongfully.

2. Evidence that a person was or was not insured against liability *is* admissible when offered for any other purpose which is relevant and basic to a fair trial.

3. The trial court may, in its discretion, admit evidence of insurance coverage if it believes that its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Contrariwise, in its discretion, the trial court may exclude evidence of insurance coverage.

4. The trial court's ruling can only be held to be reversible error in the event of an abuse of that discretion.

 The fiction of which Judge Carmody spoke in *Olguin* in 1943 has not been discarded. It has been pierced. Yesterday, it was proper on cross-examination to ask a claims investigator if he were working for an insurance company—*Hale v. Furr's Incorporated*, 85 N.M. 246, 511 P.2d 572 (Ct. App.1973), Sutin, J., Specially Concurring. Today it is proper on direct examination or redirect examination. *Wood v. Dwyer*, 85 N.M. 687, 515 P.2d 1291 (Ct.App.1973).

The trial court did not abuse its discretion in allowing disclosure of the fact that defendant was insured.

E. *Remarks by plaintiff's lawyer did not deny defendant its right to a fair trial.*

Defendant argues that "Throughout the course of the trial, plaintiff's attorney deliberately made improper remarks about defendant and about defendant's attorney in the presence of the jury." An example given occurred during plaintiff's final oral argument. The remaining seven examples occurred during the course of the trial. We have examined them all and find that during 8 days of the proceedings, defendant had a fair trial based upon the following established rules.

(1) *Oral argument was proper.*

 At the end of his final closing argument, plaintiff's attorney said:

> And I say to you, ladies and gentlemen, it would indeed be a travesty of justice if the defendant in a case like this could get ahold of the evidence and destroy it, when it wasn't even his, and then elimi-

nate the case. That wouldn't be right, and that isn't the law, and that isn't the way this should go.

Defendant claims that the purpose of these remarks was to prejudice the jury against the defendant by accusing defendant of intentionally destroying evidence which plaintiff needed. Even if we assumed that the remarks were improper, which we do not, defendant's claim of prejudicial error disappears under all of the various rules following which were adopted by the Supreme Court.

(a) *Alleged error was not preserved for review.*

■■■■ Defendant did not object to the above portion of oral argument nor was the judge requested to caution the jury. Defendant's lawyers, long experienced in trial of civil cases, experienced this problem in *Hunter v. Kenney*, 77 N.M. 336, 422 P.2d 623 (1967). As plaintiff's attorney in *Hunter*, he objected to defendant's oral argument because it was really improper. The objection was overruled. The Supreme Court held that plaintiff did not properly preserve this point for review. The objection to alleged improper argument must be specified and made known to the court so that the court may intelligently rule thereon. When that is not done, the proposition is not properly reviewable on appeal. In any event, the trial court has wide discretion in controlling argument of lawyers in addressing the jury and absent a clear abuse of discretion, it is not for us to interfere.

■■■■ A party cannot complain on appeal that oral argument was prejudicial if no objections were made at the trial. Objections should be made in time for the trial court to rule on them and to correct them, where it is possible to correct them by a cautionary instruction before the jury retires. *McCauley v. Ray*, 80 N.M. 171, 453 P.2d 192 (1968); *Jackson v. Southwestern Public Service Company*, 66 N.M. 458, 349 P.2d 1029 (1960).

(b) *The alleged error was not outside the record.*

*Griego v. Conwell*, 54 N.M. 287, 222 P.2d 606 (1950) sounded the warning that absent objections, a judgment will be reversed and a new trial ordered where lawyers go outside the record when they address the jury or attempt to influence the minds of the jury against opposing litigants. Such a case was *Chavez v. Valdez*, 64 N.M. 143, 325 P.2d 919 (1958). But the matter complained of must attain a degree of seriousness. *Bailey v. Jeffries-Eaves, Inc.*, 76 N.M. 278, 414 P.2d 503 (1966); *Baros v. Kazmierczwk*, 68 N.M. 421, 362 P.2d 798 (1961). We do note that in *Chavez* and *Baros* motions were made for a mistrial.

"It is not every inaccuracy or flight of oratory that will constitute error." *Jackson, supra* [66 N.M. at 474, 349 P.2d at 1039].

■■■■ The *Griego* rule is a rule of last resort. It applies in the absence of objections made and in the absence of any discretion exercised on the part of the trial court. We should not apply the rule unless we are satisfied that the argument presented to the jury was so flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct. Plaintiff's lawyer's argument did not go outside the record.

We hold that the *Griego* rule was not applicable here.

(c) *The discretion of the trial court is the test.*

■■■■ *Beal v. Southern Union Gas Co.*, 66 N.M. 424, 349 P.2d 337 (1960) holds that it is for the trial judge, within his sound discretion, to determine if lawyers have transgressed the grounds of professional duty or whether there has been prejudicial misconduct in argument presented to the jury. Arguments are under the supervisory control of the trial court which has wide discretion in this regard. We must assume that the only part to be played by an appellate court under the *Beal* rule is to determine whether the trial court abused its discretion.

694

The trial court can best judge the effect of oral argument upon the minds of the jury, especially in long and tedious trials.

Defendant sought a new trial. One of the reasons stated was improper oral argument stated above. In a hearing on the motion, defendant argued strongly that the closing argument of plaintiff's attorney was prejudicial error. The motion was denied. We agree with the trial court's ruling.

(2) *Alleged error of remarks during course of trial was not prejudicial.*

Defendant points to seven examples of improper remarks made by plaintiff's attorney during the course of the entire trial. In *Higgins v. Hermes*, 89 N.M. 379, 552 P.2d 1227 (Ct.App.1976), this Court adopted the rule that to constitute prejudicial error based upon improper remarks during the entire trial, the result must be characterized as a "miscarriage of justice." We hold that the result was fair.

The conduct of lawyers during trial should be characterized by candor and fairness. It is not candid or fair for lawyers to engage in a shouting match in open court and such conduct and language have no place in a court of law. This Court does not condone such conduct and language. *Apodacà v. United States Fidelity and Guaranty Co.*, 78 N.M. 501, 433 P.2d 86 (1967). In *Apodaca*, plaintiff's lawyer in the instant case charged defendant's lawyer with every type of misconduct before the jury but to no avail.

Opposing lawyers in the instant case appear to be emotional and sensitive during the struggle to win a lawsuit before a jury. The trial court sought to see that the lawyers conducted themselves properly and with respect according to the canons of ethics of our profession and the oath which all attorneys have taken. *Apodaca, supra.* When lawyers continue to carry on a shouting match, neither can claim prejudicial error. Nevertheless, a review of the record discloses that in most part, the remarks of plaintiff's lawyer were provoked by defendant's lawyer.

No basis can be found upon which to hold that the alleged claims of prejudicial error with reverence to plaintiff's lawyer's oral argument nor remarks during trial.

F. *The award of $335,000.00 to plaintiff was not excessive as a matter of law.*

The jury awarded plaintiff the sum of $335,000.00 for injuries suffered when the tank exploded in 1973. Trial was held five years later.

At the time of the explosion on August 10, 1973, plaintiff was 55 years of age with a life expectancy of 21 years. He was rendered unconscious by reason of a skull fracture. Being a very sick man, he was taken to a hospital for treatment and observation. His head injury was sutured. Although the symptoms have left, plaintiff may not have recovered from his head injury.

Blood from his head injury caused his neck to become stiff and painful. He wore a collar brace. Doctors gave up trying to cure the neck problem with conservative means, and two years later, plaintiff underwent a neck fusion. Surgery was a matter of mediocre success. Thereafter, plaintiff continued to suffer persistent pain in the shoulder and restrictions in the mobility of his neck.

Plaintiff also suffered a low back sprain, underwent traction treatments, medication and injections without relief. Significantly worse changes took place since the time of the explosion. As a result, it is highly probable that plaintiff will need surgery in the low back area.

Plaintiff also suffered a moderately severe neurosensory type hearing loss in both ears as a result of damages to the inner organ of the ears, a nerve mechanism. This hearing loss was binaural to the extent of 58.3%. He wears a hearing aid, a microphone with a loud speaker. It does not cure the hearing problem. It has created difficulty in conversation.

Generally, plaintiff suffered nerve root injuries that extended from the shoulder down through the arm, hip and legs. Heat

therapy for the hip felt and looked like a piece of roast beef at the end of each treatment. Plaintiff was unable to lift things that weighed 20 to 30 pounds. His hands gave way. Limitations of leg movement resulted in inability to walk more than a block. Loss of leg control occurred. Walking on steps "tore his back up." He suffered cramps in his leg.

To all of the foregoing, add severe headaches, constant pain, vomiting and impairment of speech. Every four or five days when pain got so severe that he could not take it, plaintiff went to a chiropractor for adjustments. Often he must return several times until his muscles relax enough to overcome pain with use of a vibrator.

A host of doctors and chiropractors have not solved plaintiff's medical problems with treatment. In fact, plaintiff was declared to be totally and permanently disabled five years after the explosion. He has not been able to work since his neck operation in July, 1975 and shall not be able to work the remainder of his life. All of his former recreational, family and social joys have been removed during his lifetime. Plaintiff now is a "complainer."

■■■■ It is not the duty of an appellate court to evaluate the mental and physical suffering that comes from severe and constant headaches and pain reasonably certain to be experienced for a period of 21 years more or less. This evaluation is for the jury to determine and for the trial court to approve or disapprove. When the jury makes a determination and the trial court approves, the amount awarded in dollars stands in the strongest position known in the law. The trial court sees the various witnesses, observes their demeanor during direct and cross-examination, as well as the attitude of the jurors during the progress of the trial, and the conduct of lawyers. We read the cold record. An appellate court will not disturb the award unless it factually appears that the jury was influenced by partiality, prejudice, corruption, a mistaken view of the evidence, or that the amount awarded is shocking to the mind of a reasonable person.

■■ While most courts, like our own, recognize that pain and suffering constitute legitimate elements of damages in tort claims, one will search in vain for any extensive judicial analysis of its essential components. The meaning of pain and suffering, and the rules of law applicable thereto are matters of first impression. For an explanation thereof, see, *Rael v. F & S Company, Inc.*, No. 3486, filed October 11, 1979, Sutin, J., dissenting.

By U.J.I. No. 14.5, we have set the guidelines.

\* \* \* \* \* \*

The guide for you to follow in determining compensation for pain and suffering, if any, is the enlightened conscience of impartial jurors acting under the sanctity of your oath to compensate the plaintiffs with fairness to all parties to this action.

No one can measure another's pain and suffering; only the person suffering knows how much he or she is suffering, and even this person cannot accurately say what would be reasonable compensation for it. The only standards or guide for a juror to use is his or her common sense.

Almost a quarter century ago, Justice Lujan established the common sense rule to be applied by an appellate court. In *Mathis v. Atchison, Topeka and Santa Fe Railway Co.*, 61 N.M. 330, 337, 300 P.2d 482, 487 (1956), he wrote:

\* \* \* There is no standard fixed by law for measuring the value of human pain and suffering. In every case of personal injury a wide latitude is allowed for the exercise of the judgment of the jury, and unless it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience, this court cannot substitute its judgment for that of the jury

. . . . .

The damages awarded were not excessive as a matter of law.

Defendant raised six additional points in this appeal. We do not find them suffi-

ciently meritorious to warrant any discussion.

Affirmed.

IT IS SO ORDERED.

LOPEZ, J., concurs.

WOOD, C. J., specially concurs.

WOOD, Chief Judge (specially concurring).

I concur in the result reached by Judge Sutin. My reasons follow.

1. In arguing the sufficiency of the evidence, defendant failed to comply with Rule of Civ.App.Proc. 9(d) in that defendant did not state the substance of all evidence bearing on this issue. Instead, defendant argues insufficiency by taking testimony out of context and, in effect, asks this Court to weigh the evidence. Contrary to defendant's contention, there is evidence that the weld which failed was defective. The defect was either metal fatigue, the absence of an inside weld, or insufficient penetration of the weld. Defendant contends there was no evidence that a defect existed when it left the manufacturer. The evidence of no changes in the tank subsequent to manufacture and the evidence that the tank was properly used, permits the inference that the defect existed while the tank was with the manufacturer. Contrary to defendant's contention, the testimony supporting the verdict is not based on speculation and conjecture.

Defendant attempts to obfuscate the evidence issue by asserting that plaintiff could not rely on res ipsa loquitur; plaintiff did not rely on res ipsa loquitur. Another attempt at obfuscation is the claim that expert witnesses judged the credibility of other witnesses. This claim simply disregards the testimony of the experts, and is not supported by the record. Related to these obfuscations are additional claims, not discussed by Judge Sutin. One claim is that the witness Johns was not qualified to express an opinion as to the cause of the explosion. Another claim is that the plaintiff was not qualified to testify concerning penetration of the weld that failed. The record in this case shows that the testimony of Johns and plaintiff was admissible under Evidence Rule 701. *Jesko v. Stauffer Chemical Company*, 89 N.M. 786, 558 P.2d 55 (Ct.App.1976).

2. Defendant's argument concerning the A.S.M.E. Standards is that, at the time of the explosion, the Standards had not been adopted in New Mexico. Whether or not adopted in New Mexico, relevancy of the Standards was established by testimony that the Standards were used by defendant in manufacturing the tank in question.

3. I agree with defendant that the method of interjecting insurance into this case goes beyond the facts of prior New Mexico cases; I have found no New Mexico case where plaintiff interjected insurance by questioning his own witness on direct examination. As I read Evidence Rule 411, the admissibility of testimony which informs the jury of insurance coverage depends on relevancy, and not on whether the testimony is elicited on direct, cross or rebuttal.

I disagree with Judge Sutin's comment that Hartford Insurance Group was the real party in interest. There are simply too many variables in the relationship between insurer and insured to make such a statement. Testimony identifying a party's insurer does not permit an inference that the insurance covered the event in question, or that the insurer would pay all or part of a judgment entered against the insured party. Whether one is a real party in interest depends on the facts, and a reference to an insurance company, without more, is insufficient to establish the facts.

In permitting the identification of Hartford Insurance Group as an insurer of defendant, the trial court did not abuse its discretion. *MacTyres, Inc. v. Vigil*, 92 N.M. 446, 589 P.2d 1037 (1979). The interest of DiSylvester, the person who heard Smith's "bad seam" remark, was relevant in determining whether Smith made the remark and in determining the credibility of DiSylvester, the person who testified the remark was made. It is unnecessary to decide

whether this interest, standing alone, was sufficient because there was more. In cross-examining the personnel manager of plaintiff's employer, defendant justified questions concerning workmen's compensation "in that Montgomery Ward is the subrogated insurance carrier . . . ." In successfully objecting to portions of Smith's deposition, which plaintiff sought to introduce, defendant was able to leave the inference with the jury that DiSylvester was "a man from Montgomery Ward." The trial court could properly allow plaintiff to correct the false impression that defendant had placed before the jury. See *State v. Bazan*, 90 N.M. 209, 561 P.2d 482 (Ct.App. 1977). There was no abuse of discretion in permitting the identification of the insurer because of the combination of DiSylvester's interest and the false impression left with the jury as to DiSylvester's position in the case.

4. Judge Sutin discusses defendant's contention that plaintiff's attorney denied defendant a fair trial by deliberate and prejudicial remarks. A related contention of defendant, not discussed by Judge Sutin, is that the conduct of the trial judge deprived defendant of a fair trial. Defendant did not object to some of the items on which he relies. Defendant takes some of the items out of context. A review of the record shows an obstreperous attorney for defendant who provoked plaintiff's attorney into giving as well as he got. There were times when the attorneys were so occupied with arguing with one another that they were slow to heed the trial court's admonition to desist. The details of the various arguments between counsel, the interruptions of counsel, and the objections made to the trial court need not be reviewed. The record shows that more of the offending was by defendant's counsel than by plaintiff's counsel. The record shows the trial court never abdicated its function to keep counsel in line; rather, the record shows the trial court was alert to the problems caused by counsel and worked at the job of keeping control of the trial. Defendant's claims of being denied a fair trial are meritless.

5. There is evidence of special damages consisting of past and future medical expense and lost earning capacity figured on a 10.9-year work-life expectancy. The special damages totaled $115,709. At the time of the accident, plaintiff had a life expectancy of 21.8 years. At the time of trial he was totally incapacitated from work; he has a severe limitation on his ability to walk, a 58 percent hearing loss, impairment of speech, severe headaches and almost constant pain. These residuals came about after injuries to the skull, neck and low back. The evidence does not permit this Court to hold the damages were excessive as a matter of law. *Gonzales v. General Motors Corporation*, 89 N.M. 474, 553 P.2d 1281 (Ct.App.1976).

6. Defendant contends that two instructions were erroneous, that certain exhibits were improperly admitted, and that there was cumulative error. I agree with Judge Sutin that these contentions are not sufficiently meritorious to require discussion.