Jimmy HOSKIE, individually and as Administrator of the Estate of Pauline Hoskie, deceased, and as father and next friend of Tilman Hoskie, a minor, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 79–1680.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 27, 1981.

Decided Dec. 22, 1981.

Laura M. Goldsmith, Gallup, N. M. (William A. Goldsmith, Gallup, N. M., with her on briefs), for plaintiff-appellant.

R. E. Thompson, U. S. Atty., D. N. M., Albuquerque, N. M., for defendant-appellee.

Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.

McKAY, Circuit Judge.

In this case, appellants Tilman Hoskie, a minor, and his parents, Pauline and Jimmy Hoskie, argue that they were awarded insufficient damages in their medical malpractice suit against the United States brought under the Federal Tort Claims Act, 28 U.S.C. § 2671–2680 (1976). This case arises from very serious malpractice by government employees in their treatment of Tilman Hoskie at the Gallup Indian Medical Center in Gallup, New Mexico, on August 17, 1977. When he was two-and-one-half years old, Tilman Hoskie entered the medical facility for a routine bronchoscopy to remove a sunflower seed that had lodged in his bronchial tube a few hours earlier. During the course of treatment, Tilman was given an injection of 10 milligrams of morphine as a sedative, a dose several times that recommended for a child of his age and weight. Within a few hours, Tilman lapsed into a coma and remained unresponsive for several days. When he gradually emerged from unconsciousness, it was determined that the overdose of morphine had depressed his breathing function, depriving his brain of oxygen and causing permanent brain damage. As a result, Tilman's motor functions, his hand-eye coordination, and his intellectual and social abilities were severely and permanently impaired. After a trial in the United States District Court for the District of New Mexico, the trial judge, sitting as trier of fact, concluded that Tilman Hoskie's brain damage occurred as a proximate result of negligence by the employees of the United States public health service facility. A judgment of $236,101 was entered against

defendants, which is the subject of this appeal.[1] Specifically, appellants claim: (1) that the district court applied an inordinately high discount rate to reduce the award for future loss of earning capacity to its present value; (2) that the district court's finding of fact and judgment of $25,000 for pain and suffering was so inadequate as to be clearly erroneous; and (3) that the district court erred in dismissing prior to trial the portion of plaintiffs' complaint seeking damages for the loss of services, society, and affection of their child.

Cases brought under the Federal Tort Claims Act (FTCA) are tried by the court sitting without a jury. 28 U.S.C. § 2402. In reviewing such cases, the appellate court will not set aside the trial court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a). The "clearly erroneous" standard applies to the review of findings of fact concerning the amount of damages in a tort action. See, e.g., Sanders v. Leech, 158 F.2d 486, 487 (5th Cir. 1946); Chesser v. United States, 387 F.2d 119, 120 (5th Cir. 1967); Hysell v. Iowa Public Service Co., 534 F.2d 775, 786 (8th Cir. 1976); Felder v. United States, 543 F.2d 657, 664 (9th Cir. 1976). This standard is a stringent one. The Supreme Court has stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Trial courts are vested with broad discretion in awarding damages, and appellate courts do not lightly engage in a review of a trial court's actions.

The evidence in this case shows that before entering the medical facility, Tilman Hoskie was a healthy, normal, well-coordinated two-and-one-half-year-old child who could walk, speak in sentences, ride a tricy-

---

1. The judge awarded $25,000 for Tilman Hoskie's pain and suffering; $206,101 for his loss of earning capacity; and $5,000 to Pauline Ho-

skie for wages lost in staying home from work to nurse Tilman.

cle and was toilet trained. Since the morphine incident, his body has been spastic and rigid. He has suffered foaming at the mouth and convulsions requiring hospitalization. He now walks with a spastic gait, even with the aid of leg braces. He cannot run, ride a tricycle, nor play even the most elementary sports. At age four-and-one-half, he cannot speak clearly and is no longer toilet trained. In addition, his vision, eye-hand coordination, and speech functions have been adversely affected. Professionals who have examined and treated Tilman have concluded that although his condition may improve gradually, he will remain mentally retarded and his motor abilities will not likely return to normal. Because he will never again function as a normal human being, he will require some form of supervision for the rest of his life. If he is ever able to work, it will only be in a sheltered workshop environment. As a result of defendant's negligence, Tilman is severely and permanently retarded, both physically and mentally.

In examining the sufficiency of this damage award, we note that at every juncture the trial court adopted almost verbatim the defendant's proposed findings of fact with respect to the amount of damages. Although this does not constitute error in itself, *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964), it requires us to approach this case with full recognition that the trial court adopted the least favorable position with respect to damages for this severely injured young boy.

### I. Loss of Earning Capacity

In assessing damages for loss of future earning capacity, the trier of fact must reduce a lump sum award to its present value. *Chesapeake & Ohio Railway v. Kelly*, 241 U.S. 485, 489–91, 36 S.Ct. 630, 631–32, 60 L.Ed. 1117 (1916). *See also Steckler v. United States*, 549 F.2d 1372, 1378 (10th Cir. 1977); *Deweese v. United States*, 576 F.2d 802, 808–09 (10th Cir. 1978). The court must calculate an amount of money that can be invested in a reasonably safe long-term investment available to the average person, which ultimately will yield a sum equal to plaintiff's lost income over the span of his working life expectancy. In this case, the trial judge accepted in its entirety the testimony of the defendant's expert witness on the issue of Tilman's lost earning capacity. In doing so, the judge adopted the expert's use of a 9.5 percent discount rate, which was based on the current yield of triple A-rated corporate bonds. Record, vol. 6, at 409.

On appeal, plaintiffs claim that this discount rate is unreasonably high, resulting in an overly large discount and hence an inadequate award. Plaintiffs' expert testified at trial that a four percent discount rate, the interest rate available on long-term insurance annuity policies, would be appropriate in this case. Although the expert acknowledged that higher interest rates are available on other types of investments, it was his opinion that an annuity policy is better suited to those not well-versed in money market matters, and is the only reasonable investment whereby a fixed rate of return can be guaranteed for the entire span of Tilman's working life expectancy.

In awarding damages, the trial judge selected an exceptionally high discount rate. It is higher than discount rates applied in many reported cases,[2] and is based on the interest rate currently available on corpo-

---

**2.** In *Culver v. Slater Boat Co.*, 644 F.2d 460 (5th Cir. 1981), the court applied a 9.125 percent discount rate, the only rate put into evidence. This rate was based on the interest available on United States government bonds. No allowance was made for inflation. Significantly, these bonds had a term that spanned plaintiff's entire working life expectancy. *Id.* at 463 n.4.

The court in *Davis v. Hill Eng'r., Inc.*, 549 F.2d 314 (5th Cir. 1977), approved a 6 percent discount rate based on the interest rate paid on short-term government securities. No allowance for inflation was made. In *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30 (2d Cir. 1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981), the Second

rate bonds, one of the highest-paying and most secure investments. Although the trial judge perhaps should have placed more emphasis on the particular facts involved in this case as emphasized by plaintiffs' expert, we do not find that his adoption of the 9.5 percent figure was clearly erroneous. This conclusion is further supported by the fact that defendant's expert did adjust Tilman's future loss of earnings by an estimated 6 percent rate of wage inflation before applying the 9.5 percent discount factor. Record, vol. 6, at 407. The testimony of defendant's expert marginally supported the application of the 9.5 percent rate, and the trial judge could, in his discretion, accept that testimony.

> Circuit suggested, but did not require, that courts in that circuit use a 2 percent *net* discount rate. The court derived this rate by focusing on the historical relationship between the inflation rate and the interest rate, which it found to be relatively constant in periods of stable inflation. The court noted that economists' estimates of the real rate of interest (that is, the nominal rate of interest adjusted for inflation) through the mid-1970's range from 1.5 to 3 percent. *Id.* at 39 n.10. A 3.5 percent net discount factor was approved by the circuit court in *Chiarello v. Domenico Bus Serv., Inc.,* 542 F.2d 883, 886 n.4 (2d Cir. 1976). In *Espana v. United States,* 616 F.2d 41 (2d Cir. 1980), the court approved a 5 percent discount rate (without adjustment for inflation), stating that "here the district court discounted sums presently awarded ... at a rate of only 5%, when in fact interest rates at the time of trial were considerably higher." *Id.* at 44. The court cited a footnote in *Dullard v. Berkeley Assoc.,* 606 F.2d 890, 895 n.3 (2d Cir. 1979), in which the court pointed out the current interest rates on treasury notes, high grade corporate bond funds and bank certificates. The plaintiff's life expectancy in *Espana,* however, was considerably shorter than Tilman Hoskie's.
>
> See also *Dullard v. Berkeley Assoc.,* 606 F.2d 890 (2d Cir. 1979) (1.5% net rate); *Hooks v. Washington Sheraton Corp.,* 578 F.2d 313 (D.C. Cir.1977) (7% after adjusting for inflation); *Menard v. Penrod Drilling Co.,* 538 F.2d 1084 (5th Cir. 1976) (4.5%); *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir. 1975) (1.5% net); *In re United States Steel Corp.,* 479 F.2d 489 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973) (4%); *Ramsey v. Georgia-Pacific Corp.,* 511 F.Supp. 393 (S.D. Miss.1981) (7%); *Nesmith v. Texaco, Inc.,* 491 F.Supp. 561 (W.D.La.1980) (2% net); *Lenherr v. NRM Corp.,* 504 F.Supp. 165 (D.Kan.1980) (6.25% after adjusting for inflation); *Robinson*

## II. Pain and Suffering

Against this backdrop, we review the court's damage award for pain and suffering. At the close of the presentation of evidence, after denying the opportunity for closing arguments, the trial judge stated:

> I thought perhaps twenty-five thousand dollars should be given to him for pain and suffering. I don't know. There is no measure for that. If I understand the books right, that's left up to the enlightened conscience of people nowadays, and my enlightened conscience would believe, I think, that twenty-five thousand dollars would be the proper amount for pain and suffering. *I don't know how much he had,* but I felt that was proper.

> *v. Shapiro,* 484 F.Supp. 91 (S.D.N.Y.1980) (wrongful death suit) (7% after adjusting for inflation); *Perkins v. Emerson Elec. Co.,* 482 F.Supp. 1347 (W.D.La.1980) (7%); *Walters v. Inexco Oil Co.,* 511 F.Supp. 21 (S.D.Miss.1979) (5%); *D'Angelo v. United States,* 456 F.Supp. 127 (D.Del.1978), *aff'd without published opinion,* 605 F.2d 1194 (3d Cir. 1979) (wrongful death) (6%); *Consolidated Machines, Inc. v. Protein Prod. Corp.,* 428 F.Supp. 209 (M.D.Fla. 1976) (5%).
>
> For those not well versed in the economic theory of reduction to present value, a caveat is in order. Comparison of the discount rate used in the instant case with those used in other cases cited in this footnote can be misleading unless one fully understands the method used by the particular court to discount a future lump sum to present value. One method is the "net" approach, under which the inflation rate is subtracted from the interest rate to arrive at the inflation-adjusted (net) discount rate; the future lump sum, unadjusted for inflation, is then reduced by application of the net discount rate. Another method involves an upward adjustment of the future lump sum by multiplying by an inflation rate, followed by a reduction of the inflation-adjusted lump sum by a (gross) discount rate. Some courts refuse to permit any sort of adjustment for inflation. Other courts view the inflation rate as offsetting the interest rate and therefore allow neither an adjustment for inflation nor a discount to present value. These various approaches are explained in the Tenth Circuit case of *Steckler v. United States,* 549 F.2d 1372 (10th Cir. 1977). It cannot be overemphasized that comparing discount rates in two cases employing different approaches can lead to an erroneous conclusion.

Record, vol. 6, at 497, 500–501 (emphasis added). The trial judge's statement, "I. don't know how much he had," suggests that perhaps he did not consider all the elements of damage cognizable under the rubric of pain and suffering as defined by New Mexico law, the applicable law in this FTCA case.[3] As the New Mexico appellate courts recently have lamented, the rules applicable to pain and suffering recovery have not been well-defined. In *Grammer v. Kohlhaas Tank & Equipment Co.*, 93 N.M. 685, 604 P.2d 823 (Ct.App.1979), the court stated, "[w]hile most courts, like our own, recognize that pain and suffering constitute legitimate elements of damages in tort claims, one will search in vain for any extensive judicial analysis of its essential components." *Id.* at 695, 604 P.2d at 833. *See also Rael v. F & S Co.*, 94 N.M. 507, 513–15, 612 P.2d 1318, 1324–26 (Ct.App.1979) (Sutin, J., concurring and dissenting). Nevertheless, in *Rutledge v. Johnson*, 81 N.M. 217, 465 P.2d 274 (1970), the New Mexico Supreme Court clearly recognized that past and future mental pain and anguish, as well as past and future physical pain and suffering, are legally compensable items of damage. *Id.* at 219–20, 465 P.2d at 276–77. In addition, on several occasions New Mexico courts have characterized compensation for impairment of physical and social activities as damages for pain and suffering. In *Scofield v. J. W. Jones Construction Co.*, 64 N.M. 319, 328 P.2d 389 (1958), the New Mexico Supreme Court noted in reviewing a damage award that plaintiff was no longer able "to walk fast or indulge in exercise such as playing golf of which he was very fond," and further that he must "go through life crippled to some extent and handicapped in his daily life and activities." *Id.* at 324, 328 P.2d at 394. The New Mexico appellate courts in reviewing damage awards have also taken into account the limitations injuries place on physical and social activities. *See, e.g., Grammer v. Kohlhaas Tank & Equipment Co.*, 93 N.M. 685, 695, 604 P.2d 823, 833 (Ct.App.1979) ("all of his former recreational, family and social joys have been removed during his lifetime"); *Hale v. Furr's Inc.*, 85 N.M. 246, 252, 511 P.2d 572, 578 (Ct.App.1973) (plaintiff could no longer ride horses, build corrals, or dance); *Francis v. Johnson*, 81 N.M. 648, 652, 471 P.2d 682, 686 (Ct.App.1970) (plaintiff "cannot engage in sports which may result in physical contact because of potential injury to the only remaining kidney").

Defendant argues that it would be improper to separately compensate Tilman for injuries that curtail his future activities because New Mexico has not recognized "loss of enjoyment of life" as a compensable cause of action. In reviewing a damage award in *Wells v. Colorado College*, 478 F.2d 158 (10th Cir. 1973), defendants made a similar claim under Colorado law, which also did not specifically recognize a cause of action for loss of enjoyment of life. In that case, this court recognized that loss of enjoyment of life was a proper component of damages for mental pain and suffering, if not a separate element of damage altogether. *Id.* at 163. In any event, it is clear that a state which compensates a plaintiff for the fact that he or she can no longer "walk fast," play golf, dance, or ride horses would not exclude from recovery factors such as Tilman's inability to walk at all without the aid of braces; the fact that he falls frequently and walks in a clumsy, frustrating manner; his inability to ride his tricycle because he can neither balance nor pedal; the fact that he will never be able to participate in school sports, as his father and uncle did; the fact that he must still wear diapers; his inability to speak normally; and the fact that his IQ is below 50. In short, Tilman has lost the ability to perform elementary physical and intellectual tasks that most people take for granted, and he should be justly compensated for that loss.

Our review of the record convinces us that the trial court did not take into

---

**3.** A federal court is bound to follow the law of the state in which the injuries occurred in an action arising under the Federal Tort Claims Act. 28 U.S.C. § 1346(b).

account all the relevant considerations defined by New Mexico law in making an award for Tilman's pain and suffering. The amount of the award is very small when compared with the severity of permanent, debilitating injuries.[4] *See Barnes v. Smith*, 305 F.2d 226, 228 (10th Cir. 1962). This fact, in conjunction with the trial judge's remarks at the close of trial, indicates to us that the court's attention was focused solely upon the pain and suffering Tilman experienced at the time of the actual injury. The judge apparently did not consider the future pain and suffering caused by his mental and physical disabilities that Tilman, with a life expectancy in excess of 60 years, must endure for a lifetime.

Consideration of future pain and suffering is particularly important in a case involving brain damage because brain injuries are typically severe and permanent. For this reason, other courts have recognized that when brain damage is involved, a more flexible definition of pain and suffering must be used. Compensable injuries from brain damage have been described as the "loss of the capacity for mental and physical development," *Sox v. United States*, 187 F.Supp. 465, 469 (E.D.S.C.1960), or the "daily frustrations of retardation," *Caron v. United States*, 410 F.Supp. 378, 396 (D.R.I.), aff'd, 548 F.2d 366 (1st Cir. 1976), but however described, they are substantial. In short, the compensable pain and suffering from injuries to the brain extends far beyond that suffered at the time the initial injury occurs.

■ Although the trial court has broad discretion in determining the amount to be awarded to a plaintiff in a tort action, that discretion is not immune from review. Our review of the evidence and the applicable law leaves us "with the definite and firm conviction that a mistake has been committed" in this case, resulting in an inadequate award. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The amount awarded for pain and suffering does not begin to reflect the overwhelming evidence as to the extent of Tilman's past, present, and especially future pain and suffering, particularly in view of the fact that he will

---

4. In *Barnes v. Smith*, 305 F.2d 226 (10th Cir. 1962), this court stated "that in most instances the only guide available upon review to test the properness of an award is a comparison of amount with injury." *Id.* at 228. It is a difficult and often fruitless task to compare damages in one case with those in another, and we do not generally countenance such comparisons. However, our review of damage awards in other cases involving permanent brain damage reinforces our conclusion that the trial judge did not take all the relevant considerations into account when he made this award for pain and suffering. *See, e.g., Caron v. United States*, 410 F.Supp. 378 (D.R.I.), aff'd, 548 F.2d 366 (1st Cir. 1976) (circuit court approved award of $500,000 for pain and suffering in FTCA case involving permanent brain damage); *Frankel v. United States*, 321 F.Supp. 1331 (E.D.Pa.1970), aff'd sub nom., *Frankel v. Heym*, 466 F.2d 1226 (3d Cir. 1972) (FTCA case in which circuit court approved award of $650,-000 for pain and suffering, loss of life's pleasures, inconvenience, permanent injuries, and disfigurement in a brain injury case); *Tinnerholm v. Parke, Davis & Co.*, 411 F.2d 48 (2d Cir. 1969) (circuit court upheld $400,000 pain and suffering award in a case where three-month-

old child suffered brain damage after being injected with a vaccine).

In addition, we note that New Mexico courts have typically been as generous and usually more generous in compensating those suffering permanent injuries and disabilities, even when the plaintiffs' life expectancies have been less than one-half the 60-plus years that Tilman faces. *See, e.g., Scofield v. J. W. Jones Constr. Co.*, 64 N.M. 319, 328 P.2d 389 (1958) (10% permanent disability from knee injury to an adult, $20,000 for pain and suffering); *Grammer v. Kohlhaas Tank & Equip. Co.*, 93 N.M. 685, 604 P.2d 823 (Ct.App.1979) (head injury precipitating physical disabilities, $335,000 pain and suffering award to man with life expectancy of 21 years); *Hale v. Furr's Inc.*, 85 N.M. 246, 511 P.2d 572 (Ct.App.1973) (15% permanent disability of woman with life expectancy of 26 years, $25,000 award for pain and suffering, 8 years ago).

Finally, in *Bryant v. United States*, 565 F.2d 650 (10th Cir. 1977), an FTCA case, the court affirmed an award of $300,000 to each of three children who lost part of their feet and legs to frostbite due to the negligence of officials at a boarding school administered by the Bureau of Indian Affairs.

continue to suffer from these injuries for the remainder of his life. Although in this type of case it is impossible to establish a precise standard for measuring damages, we nevertheless believe that Tilman is entitled to an additional, substantial award for pain and suffering. An order will be entered vacating the judgment of the district court on this point and remanding this case for a recomputation of the damage award for pain and suffering.

### III. Loss of Consortium

■ The district judge correctly dismissed Pauline and Jimmy Hoskie's claim for damages for loss of Tilman's services, society, and affection. After a pre-trial hearing, the judge concluded that New Mexico law "[d]oes not permit parents to recover for lost consortium from their child in a negligence action." Record, vol. 1, at 16. There is presently no New Mexico case law on this particular issue. However, the New Mexico Supreme Court has refused to recognize a wife's cause of action for loss of consortium when her husband was negligently injured. *Roseberry v. Starkovich*, 73 N.M. 211, 387 P.2d 321 (1963). Furthermore, the New Mexico Jury Instructions specifically forbid an instruction for loss of consortium to be given at trial. UJI Civ. 21.12, N.M.Stat.Ann., Judicial Vol. 2 (1980). From our review of New Mexico law, we conclude that the district court correctly interpreted that state's law on this issue.

The judgment of the district court is vacated in part and the case is remanded for proceedings in accordance with this opinion.

VACATED IN PART and REMANDED.