**Candido GARCIA and Albina Connie Garcia, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 87–F–1234.**

United States District Court, D. Colorado.

Oct. 21, 1988.

Doris Besikof, Denver, Colo., for plaintiffs.

Robert N. Miller, U.S. Atty., Chalk S. Mitchell, Asst. U.S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

This case involves a claim of medical malpractice as result of plaintiff Candido Garcia's hospitalization and medical treatment at the Veterans Administration Medical Center ("VAMC") in Denver. Mr. Garcia is a quadriplegic and is bedridden. His physical condition is severely impaired. He has numerous physical and medical problems including the necessity of a tracheotomy to assist his breathing. He is able to speak but with great difficulty. His mental processes, including memory, are impaired. At the time of this incident on August 30, 1985, he was 53 years of age, and is presently 56 years of age.

Together with his wife, Albina Connie Garcia, Mr. Garcia seeks damages for his condition and injuries allegedly suffered at the VAMC. Claims are made under the

Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, with jurisdiction provided by 28 U.S.C. § 1346(b).

Trial on the merits was heard by the Court. We have considered the testimony at trial, exhibits, applicable depositions, pretrial and post-trial briefs, and statements of position.

We find and conclude that defendant Veterans Administration Medical Center is liable, and the issues are joined in favor of the plaintiffs and against the defendant United States of America, the operator of the Veterans Administration Medical Center.

The court enters these findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Candido Garcia was treated at the VAMC, Denver, Colorado on August 29, 1985 for removal of chronic subdural hematomas. Plaintiff had been treated at VAMC on several previous occasions for neurological problems. Mr. Garcia consented to surgery to remove the hematomas, and was informed of the risks of the operation. The surgery was conducted between 1:00–5:30 PM on August 30, 1985 by Dr. Karol Zakalik. The surgery was serious in nature and consisted of draining subdural hematomas from both sides of Mr. Garcia's head, as well as modification of a low pressure ventriculi-peritoneal shunt to a medium pressure Holter–Hausner system. Jackson–Pratt drainage tubes were also placed in Mr. Garcia's head.

At trial, Dr. Jack Klapper, neurologist, testified that this operation may have been unnecessary, since the hematomas may have subsided without treatment. On the other hand, Dr. Matthew Presti, a neurologist, testified that the operation was medically reasonable, and that the hematomas probably would have grown worse without surgical treatment. However, the necessity of the operation is not an issue in this case.

2. Mr. Garcia was moved to the recovery room at about 5:30 PM. At approximately 6:25 PM he was moved to a room on Ward 6–South. With him in the room were his daughter, Gayle Garcia, and his mother. Margaret Johnson, Mr. Garcia's primary care nurse, testified that at around 7:00 PM she observed that Mr. Garcia was not experiencing any unusual symptoms. Margaret Johnson then went on her lunch break.

3. Gayle Garcia testified that shortly after 7:00 PM she observed that Mr. Garcia moved his hand to his head in pain, began making snorting noises, and white bubbles were forming at his mouth. Gayle Garcia immediately reported these facts to nurses on the ward. Gayle Garcia testified that she was aware of the time of this event, since it closely corresponded with the beginning of a football game the family intended to watch on the hospital television.

4. Albina Garcia, Mr. Garcia's wife, testified that she arrived in the room shortly thereafter. She also observed snorting noises and white bubbles at Mr. Garcia's mouth.

5. Margaret Johnson testified that she returned from lunch between 7:20 PM and 7:30 PM, and found that Mr. Garcia was unconscious and that blood in the drainage tubes running from Mr. Garcia's head was thick and red, indicating the presence of chronic bleeding.

6. Several witnesses testified that the above symptoms indicate a medical emergency, requiring prompt medical attention. The nurses treating Mr. Garcia testified that they had limited authority to render medical assistance. They were not authorized to administer medications except as prescribed beforehand by Dr. Zakalik. They testified that the extent of their responsibility was to insure that the drainage tubes were kept clear.

7. Ms. Martha Rule testified to the effect that Mr. Garcia was still conscious and in good condition at 7:20 PM and 7:55 PM. She made cursory notes to that effect in the medical chart.

8. Mr. Garcia did not receive attention from doctors until approximately 8:15 PM. The doctors called were Drs. Irene Horesh, Jack Akmakjian and John Nichols. They were at neighboring University of Colorado

Health Sciences Center, treating other neurological and surgical patients. Ms. Jeannette Mansfield called the doctors above named, and testified that she could not remember what time she made the call, and what she told the doctor who responded to her call. Ms. Mansfield did not make a "stat" call, which would have indicated that medical attention was required as soon as possible. Dr. Jack Akmakjian testified that he and Dr. Horesh did not believe the situation to be an emergency, and that the patient was stable immediately after the operation. The court notes that it does not have the benefit of testimony from Dr. Irene Horesh, who actually received the call from Ms. Mansfield.

9. When medical assistance was slow in arriving, Ms. Mansfield made another call to Drs. Akmakjian, Horesh, and Nichols. She did not attempt to contact anyone at the VAMC, because she believed there were no medical personnel there capable of handling the situation. Testimony indicates that emergency assistance was in fact available in the hospital.

10. Ms. Clare Sandekian was qualified as an expert witness. She is experienced in nursing care at large hospitals. She testified that the symptoms of Mr. Garcia indicated the presence of a medical emergency, and that it was within the professional competence of nurses to make that determination. Ms. Sandekian testified that a reasonably competent nurse would have made it clear to the medical personnel she called that an immediate response was required, such as by making a "stat" call. Ms. Kathie Clinton was called as an expert by defendant, and stated that the nurses' actions were reasonable. She, likewise, is an experienced nurse. Ms. Clinton relied on the deposition testimony of the nurses and the medical record, and did not review important testimony, in the form of the depositions of Albina and Gayle Garcia, as to the timing of critical events.

11. Dr. Charles Duncan, neurosurgeon, and Dr. Jack Klapper, neurologist, testified as expert witnesses. They testified that if Mr. Garcia had been treated promptly after he showed symptoms of a seizure, he would not have incurred his injuries. They also testified that Mr. Garcia's injuries were caused by a buildup of blood between his cranium and brain. This buildup took place during the time between his operation and the time which he was finally treated.

12. As noted, Drs. Akmakjian and Horesh finally reached Mr. Garcia around 8:15 PM. Dr. John Nichols followed shortly thereafter. Immediate surgery on Mr. Garcia was delayed because of the time needed to obtain a CT scan. In this connection, Dr. Jack Klapper testified that in his opinion the CT scan was unnecessary and that surgery should have commenced immediately. He testified that precious time was lost in obtaining the CT scan, and that earlier surgery could have prevented the devastating effects on Mr. Garcia. However, Dr. John Nichols, a member of the medical staff of VAMC, testified that the CT scan was necessary to locate Mr. Garcia's subdural hematomas. Dr. Charles Duncan also testified that the procedures taken by the doctors once they reached Mr. Garcia were within an appropriate standard of care in the relevant medical community.

13. (a) Plaintiff had undergone major surgery earlier on the day in question and constant monitoring was necessary. When plaintiff Mr. Garcia took a turn for the worse (around 7:00 PM), a serious medical emergency was clearly evident.[1] The nursing staff should have recognized the emergency nature of the situation and taken prompt steps to notify attending physicians. Standard and appropriate medical attention dictated immediate notification of the physicians. Proper and standard medical attention also required that a "stat" call should have been made, indicating that the patient was "in extremis" and in a deteriorating medical condition. This lack of expeditious medical attention to this seriously ill patient at the first sign of his deteriorating condition, around 7:00 p.m., and the

1. The more credible evidence suggests the time of Candido Garcia's seizure occurred at approximately 7:00 PM. The pivotal medical record cannot be relied on because it is incomplete and sketchy. The medical chart does not specify the actual time of the seizure.

delay thereafter to the time of his medical procedure around 8:15 PM was below an applicable standard of medical and nursing care in the community. This conduct constitutes negligence. The court expressly finds that health care professionals, including physicians and nurses, employed at the government hospital were negligent in failing to properly attend to, care for, and treat a patient subject to their care in the hospital, and that this failure resulted in severe and debilitating injury to Mr. Garcia. The results of the negligence were nearly fatal. The VAMC did not act in accordance with acceptable standards of medical care in the Denver community. The defendant, United States of America, is liable for medical malpractice.

(b) The delay in treating Mr. Garcia after he began to show symptoms of a seizure establishes actionable relief against the hospital, and plaintiffs have met the requisite burden of proof. The plaintiffs have also met their burden to prove that the delay in treating Mr. Garcia was the proximate cause of his injuries.

(c) Reasonable care for a patient in plaintiff Mr. Garcia's condition requires communication, coordination, and documentation by health care professionals—physicians and nursing staff. Communication and coordination between the nursing staff and attending physicians was sorely lacking.

14. The following has been proved: Plaintiff Mr. Garcia incurred injuries in VAMC, employees of VAMC were negligent, and this negligence was a cause of plaintiff's severe and debilitating injuries.

15. The treatment Mr. Garcia received when he *finally* received medical attention (at about 8:15 P.M.) after his seizure (around 7:00 P.M.) was within the standard of care for the medical community.

16. The medical chart (exhibit 30, page 862) is sketchy and was only minimally acceptable at best. A notation made by Ms. Margaret Johnson indicates that the entries were made at 7:00 P.M. The notes on the chart indicate that Mr. Garcia had full orientation (knowledge of time, place, and person), clear speech, and full use of strength. The notes state "x2" for con-

sciousness. The nurses testified that that notation indicates that Mr. Garcia was conscious but not fully alert. A chart notation made by Ms. Martha Rule indicates that it was made at 7:30, and that Mr. Garcia was still conscious. It also listed his blood pressure as 140 over 88, and stated that the patient responded to verbal stimuli. A further notation by Ms. Rule in the medical chart indicates that it was made at 7:55. It merely states that Mr. Garcia's blood pressure is 130 over 74. Significantly, it contains no information on Mr. Garcia's consciousness, orientation, speech or strength. Ms. Rule testified that she did not make those notations because she was new to the hospital and did not understand them. The medical chart does not specify when Mr. Garcia began to show symptoms of complications, nor does it state what those symptoms were. It does not state when the attending physicians were called or what was said to them. It does not state when the physicians finally arrived. Ms. Clare Sandekian testified that the medical chart was insufficient, and did not meet the standard for nursing care in the community. Dr. Matthew Presti testified that the medical chart was sufficient to meet the standard of care for the community, but stated on cross examination that the chart was "a mess." The court finds that the medical charts on Mr. Garcia did not meet the standard of care for the relevant medical community. While the insufficiency of these charts did not by themselves cause Mr. Garcia's injuries, the lack of information on the charts contributes to this court's conclusion that Mr. Garcia's status was not timely and sufficiently communicated to the attending physicians. The medical chart should be just that—a concise, factual memorandum of the medical progress, vital signs, and informative notes on the patient—all subject to quick reading and analysis and, if necessary, immediate response by the medical staff. "Nurses frequently question how to document the situation when a physician does not respond quickly to a call for help. The nurse should carefully document the time the physician was called and the time of his response, as well as the content of the

conversation. If the situation is serious and the physician has not responded, the nurse should notify her supervisor in addition to properly documenting what has occurred." J. Fiesta, The Law & Liability, A Guide For Nurses (2nd Ed.), p. 181. "The record, including the nurses' notes, is a critical piece of evidence in the determination of the standard of care provided. The notes should reflect, accurately and completely, the patient's condition, progress, and nursing activities for the period the charting covers.... Observations charted should lead to nursing diagnosis and describe the patient's behavior, appearance, and symptoms. Patient quotes and statements should be used. Conclusions should not be charted without supporting objective data.... Changes in the patient's status, especially signs that indicate deterioration, should be documented with extra care, along with the steps taken by the nursing staff to respond to the change." A. Rhodes, Nursing & The Law, p. 256–57. See also H. Creighton, Law Every Nurse Should Know (5th Ed.), p. 100–01; C. Northrop, Legal Issues In Nursing, p. 460–61. The nurses had a duty to properly document the steps taken to care for their patient.

17. Plaintiff was in court at the commencement of the trial. We had the opportunity to observe, in part, the extent of his injuries and physical condition. Mr. Garcia is a severely disabled person who admittedly is in pain and suffers great discomfort. He is unable to function without continuous support from medical attendants or family members. His only mobility is in a wheelchair, operated and maneuvered by family or attendants. He cannot operate the chair personally. Mr. Garcia is somewhat aware of his surroundings. He can speak in short sentences and can respond to simple, direct questions. He can speak only with someone to assist him by pressing on his chest. His injuries have resulted in severe disfigurement, and almost complete physical impairment.

18. Dr. Jeff Garrison and Ms. Carolyn Roeker, rehabilitation specialists who have had extensive opportunity to examine Mr. Garcia, testified that Mr. Garcia is quadriplegic, except that he has extremely limited movement ability in his right arm. He is totally bedridden. He requires a tracheotomy to assist his breathing. His mental processes, including his memory and cognitive ability are severely impaired. He is unable to learn to accomplish tasks, such as flipping a switch, without hundreds of opportunities to practice. He needs constant nursing attention for personal hygiene and assistance in order to accommodate bodily functions. Ms. Roeker and Albina Garcia testified that Mr. Garcia is severely depressed about his health situation. He is in a pitiful, immobilized state. He is susceptible to many disorders and infections. His medical condition will not improve, and he requires frequent therapy and medical service. Before the incident on August 30, 1985, Mr. Garcia enjoyed life with his wife Plaintiff Albina Connie Garcia. He danced, played cards, walked for pleasure, took an interest in sports, and was a contributing member of his family by attention to them and financial support. He is now a shell of his former self, with near loss of dignity. Mr. Garcia is currently in the care of a nursing home, and his injuries have left his family with the difficult choice of whether or not they can care for him at home. Albina Garcia testified that it is her and Mr. Garcia's wish that Mr. Garcia return home. Ms. Janet Fox and Mr. D.S. Rubano were qualified as expert witnesses on costs of rehabilitation. They agreed that Mr. Garcia should be cared for at home. To accommodate his condition, the Garcias would have to move to a barrier free home, or their present residence would have to be modified.

Ms. Fox estimated that Mr. Garcia's total home care costs would be $210,436 per year for the remainder of his life (plaintiffs' exhibit 27). Mr. Rubano estimated the cost of home care would be only $27,920 per year (defendant's exhibit K). The wide variation between these estimates is due in part to differing opinions as to the necessity of counseling and case management, differing estimates as to the cost of necessary medical equipment and therapy, and differing projections of the need for future

acute care for Mr. Garcia. However, the vast majority of the difference is due to varying views as to the necessity of nursing care. Ms. Fox recommended that Mr. Garcia be provided with a Registered Nurse with him at all times for 16 hours per day, a Licensed Practical Nurse for 8 hours per day, and an orderly for 4 hours per day, for a total cost of $170,820 per year. Mr. Rubano testified that Mr. Garcia needs only a single attendant, at a total cost of $18,900 per year, and that the remainder of Mr. Garcia's needs can be met by members of his family. However, rehabilitation specialists Dr. Jeff Garrison and Ms. Carolyn Roeker testified that Mr. Garcia requires around-the-clock care. They also testified that Mr. Garcia must be frequently moved, which often requires more than one person to assist him. The court is persuaded that Mr. Garcia requires some kind of trained assistance twenty-four hours per day, but doubts that a Registered Nurse is required for a majority of the day.

19. Mr. Garcia (56 years old) had some existing medical problems which interfered with his ability to work prior to the injury at issue. His tax returns for the two years preceding the injury at issue indicate reduced income from employment. In addition, Dr. James Dillon testified that Mr. Garcia's neurological problems other than the injury at issue affected his ability to work in his field, that of construction. There were periods of marginal employment. Those problems as well as the injury at issue here have reduced his life expectancy to well below average for a person of like age, which under Colorado law and in the absence of other evidence, is presumed to be 20.6 years from the date of trial. Plaintiff Mr. Garcia was 53 years of age at the time of this incident in August 1985.

20. As noted, on some major points the evidence is conflicting. The court has taken into account each witness' strength of memory and demeanor and manner while on the witness stand. The court has considered factors which affect the witness' recollection and his or her opportunity to observe and accurately relate to the matters discussed. The court has considered whether a witness' testimony has been contradicted, and the bias, prejudice, and interest, if any, of each witness.

21. We turn to another point in issue. Plaintiffs filed a notice of tort claim with the Veterans' Administration on September 8, 1986. That claim asked for damages of $1,000,000 for Mr. Garcia and $500,000 for Albina Garcia. The claim was denied on March 31, 1987. On July 24, 1987, plaintiffs filed an amended claim, this time for $10,000,000 for Mr. Garcia and $2,000,000 for Albina Garcia. The plaintiffs filed this lawsuit on August 1, 1987, seeking damages as set forth in the amended claim. That claim was denied by the Veterans' Administration on August 10, 1987. Defendant's position on this point is that the maximum amount that plaintiffs can only recover is the amount of their original claim. 28 U.S.C. § 2675(b).

22. The damages sought by plaintiffs are in excess of the amount of the original claim. At the time of the original claim, Mr. Garcia was in a coma and, according to medical reports given to Albina Garcia, was not expected to recover. He would not have benefited from home care, a wheelchair accessible van, or a barrier-free home. He would not have had the level of pain and suffering he must live with for the rest of his life. Albina Garcia would not have had to devote as much of her time to care of Mr. Garcia as she does now. Testimony reflects that she visits Mr. Garcia every day at the nursing home, and must utilize public transportation. Plaintiff Albina Garcia has undergone this tragedy without self-eulogy. The court was impressed by her dedication on behalf of her invalid husband and her sincere commitment to his comfort and well being.

23. Candido and Albina Garcia have suffered past and future economic losses of $1,300,000 (nursing care constitutes a substantial portion of this sum). Mr. Garcia has suffered past and future noneconomic losses for physical impairment and disfigurement of $550,000. Clear and convincing evidence demonstrates that Mr. Garcia has

suffered past and future noneconomic losses, (primarily pain and suffering) other than for physical impairment and disfigurement, of $300,000. Clear and convincing evidence demonstrates that Albina Garcia, as the spouse of Mr. Garcia, has suffered past and future noneconomic losses of $150,000.

In making these findings, we have considered the pain and suffering that Mr. Garcia incurred from defendant's negligence, and the fact that this suffering will continue. The mental anguish and depression suffered by Mr. Garcia are evident. His entire personality has changed and psychiatric care will be required, and estimation of this care is difficult. Rehabilitation and medical expenses are necessary for the remainder of Mr. Garcia's life, and this expense will continue to expand because of the reasonable expectation of future maladies, disorders and growing health problems to Mr. Garcia as a result of his condition. His loss of enjoyment of life, while not susceptible to exact computation, is an integral part of Mr. Garcia's sorrowful existence.

24. The damages sought by plaintiffs in this lawsuit in excess of the amount of the original administrative claim result from newly discovered evidence not reasonably discoverable at the time of presenting the original claim.

### CONCLUSIONS OF LAW

1. State law determines the standard of care for liability under the Federal Tort Claims Act. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); *Niblack v. United States*, 438 F.Supp. 383, 386 (D.Colo.1980.). Proof of malpractice in Colorado requires evidence of the standard of care in the medical community for the particular type of case at the time, and a showing by a preponderance of the evidence that there was a negligent departure from this standard of treatment. *Niblack*, 438 F.Supp. at 387–87. Plaintiffs have met this burden.

■ 2. To prove causation, plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct. *Kaiser Foundation Health Plan v. Sharp*, 741 P.2d 714, 719 (Colo.1987); *In re Swine Flu Immunization Products Liability Litigation (Alvarez)*, 495 F.Supp. 1188, 1206 (D.Colo.1980). Again, plaintiffs have met this burden.[2]

3. Under the Federal Tort Claims Act, a plaintiff cannot bring suit against the United States until the federal agency has made final disposition of the plaintiff's claim. 28 U.S.C. § 2675(a). Here, the Veteran's Administration had only made final disposition of plaintiff's first claim at the time the suit was filed. Damages are generally limited to the amount in the claim presented. 28 U.S.C. § 2675(b). However, an exception exists where, as here, the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency. *Id.* ACCORDINGLY,

IT IS ORDERED, ADJUDGED, AND DECREED that the defendant is liable for the injuries to plaintiffs on the issues. The Court directs the Clerk to enter judgment in favor of Candido Garcia and Albina Garcia and against The United States of America in the total amount of $2,300,000 plus interest.

IT IS FURTHER ORDERED that plaintiffs Candido Garcia and Albina Garcia recover the costs taxable under 28 U.S.C. § 1920.

---

**2.** State limitations on damages also apply to claims under the Federal Tort Claims Act. *Bartch v. United States*, 330 F.2d 466, 467–68 (10th Cir.1964); *Hernandez v. United States*, 383 F.Supp. 168, 170 (D.Colo.1974). In Colorado, noneconomic damages other than damages for physical impairment or disfigurement are limited to $250,000.00, or up to $500,000.00 on a showing of clear and convincing evidence. Colo.Rev.Stat. § 13–21–102.5(3)(a). Noneconomic damages for Albina Garcia are limited to $250,000.00 and must be shown by clear and convincing evidence. Colo.Rev.Stat. § 13–21–102.5(3)(b).