930 F.2d 33
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
Rodney A. HEITZENRATER & Marlinda S. Heitzenrater,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 88-2770.
 United States Court of Appeals, Tenth Circuit.
 Feb. 22, 1991.
 
 Before BALDOCK and EBEL, Circuit Judges, and SAM, District Judge.*
 ORDER AND JUDGMENT**
 EBEL, Circuit Judge.
 
 
 1
 Plaintiffs Rodney and Marlinda Heitzenrater brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b) and Secs. 2671 et seq., for injuries suffered by Mr. Heitzenrater while a patient at the Denver Veterans' Administration Hospital. The government stipulated to liability, a bench trial was held on the question of damages, and judgment was entered in favor of plaintiffs. We affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 2
 In the spring of 1983, Mr. Heitzenrater moved with his wife and children to New York, where he began working in his brother's scuba shop. Mr. Heitzenrater worked for his brother for about three weeks. During that time, he became quite fervent in his religious beliefs, which he had recently embraced as a result of attending a Pentecostal tent meeting. Mr. Heitzenrater began "preaching" to his wife and brother. He became extremely critical of Mrs. Heitzenrater, verbally abusing her and sometimes "kicking her in the backside." Mrs. Heitzenrater took the couple's children and moved out of the apartment that they had shared.
 
 
 3
 Two days later, Mr. Heitzenrater set off for Colorado. Although originally intending to seek employment in Colorado, Mr. Heitzenrater explained that the journey became dominated by his religious preoccupations. Sometime after he arrived in Denver, Mr. Heitzenrater was found in a partially incoherent state and taken to Denver General Hospital for two days of observation and psychiatric treatment.
 
 
 4
 On May 25, 1983, Mr. Heitzenrater was transferred from Denver General Hospital to the Denver Veterans' Administration Hospital. He was placed in the psychiatric ward and housed in a room on the seventh floor of the hospital. While in the V.A. hospital, Mr. Heitzenrater had a vision (later diagnosed as a brief, reactive psychosis) which led him to break through the window of the hospital and fall seven floors to the ground below.
 
 
 5
 As a result of his fall, Mr. Heitzenrater was partially paralyzed. Mr. Heitzenrater received many months of treatment, but the lower part of his body remains totally paralyzed, and he has impaired movement in his upper body such that he has been diagnosed as a quadriplegic. Mr. Heitzenrater's paralysis is permanent, and he requires assistance in performing many of the tasks necessary for day-to-day living.
 
 
 6
 Mr. and Mrs. Heitzenrater brought this action against the United States for damages sustained as a result of Mr. Heitzenrater's injuries. The government conceded liability for negligent supervision of Mr. Heitzenrater while he was a patient at the V.A. hospital. After a bench trial on the question of damages, the district court awarded damages to Mr. Heitzenrater in the amount of $5,685,502 and to Mrs. Heitzenrater in the amount of $1,098,591.
 
 
 7
 Of the twelve separate damage awards to Mr. Heitzenrater, the government appeals as excessive the following three awards: $2,000,000 for pain and suffering; $2,111,022 for future nursing services; and $603,557 for future lost earnings. Of the three separate damage awards to Mrs. Heitzenrater, the government appeals as excessive the following two: $750,000 for loss of consortium; and $215,037 for future nursing care services to be performed on behalf of her husband. The government has paid the Heitzenraters $1,067,898 to satisfy the judgment for those damage awards not appealed.
 
 DISCUSSION
 
 8
 Actions brought under the Federal Tort Claims Act ("FTCA") are tried before the district court judge without a jury. 28 U.S.C. Sec. 2402. The district court's factual findings in support of damages awarded in FTCA cases are reviewed only for clear error. See Hoskie v. United States, 666 F.2d 1353, 1354 (10th Cir.1981). A finding is clearly erroneous only if after reviewing the record, the appellate court is "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 9
 An award is excessive if it "shocks the judicial conscience." Miller v. United States Ex. Rel. Dept. of the Army, 901 F.2d 894, 897 (10th Cir.1990). See also Wells v. Colorado College, 478 F.2d 158, 162 (10th Cir.1973) (noting that a fact finder's bias, passion, or prejudice in awarding damages can be inferred from excessiveness). Accordingly, we proceed to review the five individual damage awards appealed by the government in light of this standard.
 
 A. The Award for Pain and Suffering
 
 10
 The record is replete with evidence of the pain and suffering experienced by Mr. Heitzenrater as a result of his fall. As the district court recognized in its order, there was also significant evidence presented showing that this pain and suffering will continue for the duration of Mr. Heitzenrater's life. Nevertheless, because we find the district court's award of $2,000,000 to be excessive, we reduce the award.
 
 
 11
 We begin by acknowledging how difficult it is to place a monetary value on pain and suffering:
 
 
 12
 Just as no human being can truly measure the sorrow of another, neither can he put a specific monetary price on it.... And yet, since monetary compensation is the only type we can assess against the defendant[ ] in cases such as this, we must attempt to arrive at some monetary measure.
 
 
 13
 Felder v. United States, 543 F.2d 657, 674 (9th Cir.1976). In Hoskie v. United States, 666 F.2d 1353 (10th Cir.1984), this court stated that "[i]t is a difficult and often fruitless task to compare damages in one case with those in another, and we do not generally countenance such comparisons." Id. at 1358 n. 4. Nonetheless, in Hoskie, we engaged in this exercise to review a damage award for pain and suffering under the FTCA. Our research of the published decisions of this court, the district courts within this circuit, and the highest state courts of those states within our jurisdiction has disclosed virtually no cases involving a review of damage awards for excessiveness for injuries rendering a plaintiff a quadriplegic.[1] Appellants contend that the two million dollars awarded to Mr. Heitzenrater for his pain and suffering is larger than any damage award for pain and suffering that has ever been sustained upon review for excessiveness in the state courts of Colorado. Appellees do not refute this assertion,[2] and our research has disclosed no authority to the contrary.[3] The case closest on point is Garcia v. United States, 697 F.Supp. 1570 (D.Colo.1988). In Garcia, the United States District Court for the District of Colorado awarded $300,000 in damages under the FTCA for non-economic losses, primarily pain and suffering, to a plaintiff who was rendered a quadriplegic by the defendants' medical malpractice. Id. at 1570, 1576.[4] The amount of the judgment in Garcia is a useful touchstone for determining whether the $2,000,000 pain and suffering award in this case was excessive.
 
 
 14
 If this action had arisen after 1986, the district court would have been constrained by the Colorado damages limitation statute, Colo.Rev.Stat. Sec. 13-21-102.5(3)(a), to limit Mr. Heitzenrater's damages for pain and suffering to $250,000 (or $500,000 if shown by clear and convincing evidence). Although we recognize that this statute does not control the present case,[5] it was in effect at the time the district court made its award, and we consider it to be a strong policy statement on the parameters of liability in Colorado. The policy represented by this statute as well as the paucity of Colorado appellate authority supporting awards of this size convince us that the $2,000,000 pain and suffering award was excessive.[6]
 
 
 15
 Our next task is to determine the appropriate damages to be awarded to Mr. Heitzenrater to compensate him for his pain and suffering. Our task is made easier because the parties' views as to what constitutes a fair figure seemingly converges to a figure of $1,000,000. The United States urges us to "lower the award for pain and suffering to not more than $1 million." Appellant's Br. at 15. Mr. Heizenrater in closing urged that "the interests of justice would be served by compensating [Mr. Heitzenrater] for his physical and mental pain and suffering, his loss of enjoyment of life, certainly by an amount that would be not less than one million dollars." R.Vol. VII at 605. Therefore, we modify the pain and suffering award to $1,000,000.[7]
 
 
 16
 B. The Award to Mr. Heitzenrater of $2,111,022 for Future Nursing Services
 
 
 17
 In Colorado, "[a]n award of future medical expenses must be based upon substantial evidence which establishes the reasonable probability that such expenses will necessarily be incurred." Reynolds v. Reichwein, 510 P.2d 895, 896 (Colo.Ct.App.1973). Because we hold that the district court's award was not supported by such evidence, we reverse and remand for recalculation.
 
 
 18
 In assessing the appropriate amount of damages for Mr. Heitzenrater's future nursing and rehabilitative services, the district court stated:
 
 
 19
 almost 90 percent of the damages that I award in this order are fully consistent with the recommendations of the government's advisory witness, John E. Dahlberg, in either his report of "Anticipated Annual Medical and Rehabilitation Expenses-Rodney Heitzenrater," or his testimony at trial. The actual damages amounts awarded were predominantly based on his estimates of their probable expense.
 
 
 20
 .............................................................
 
 
 21
 ...................
 
 
 22
 * * *
 
 
 23
 Based on Mr. Dahlberg's testimony and other evidence in the record, I find that these special services have a reasonable annual cost of $45,619. I further find that the present value of such future daytime nursing, nurse's aide, attendant and housecare services equals $2,111,022.
 
 
 24
 R.Vol., Doc. 3 at 9, 16. The government argues that the district court's award is not supported by evidence in the record because Mr. Dahlberg testified at trial that he no longer believed his original projection of $45,619.20 per year was correct.
 
 
 25
 On direct examination, Mr. Dahlberg testified that the estimate for annual attendant care in his report was $45,619.20. R.Vol. V at 372; see Plaintiffs' Ex. 6. However, after reading Mr. Heitzenrater's records from the rehabilitative program at Craig Hospital, Mr. Dahlberg indicated that his earlier assessment might no longer be accurate:
 
 
 26
 the next area that comes to mind is the--that I come to, rather, is the attendant care, and from looking at the records at Craig Hospital, they in several--various parts, they are talking about Mr. Heitzenrater's capability of being totally independent. If in fact he were totally independent, the first two areas of attendant care, the live-in nurse aide at $31,000 and the skilled nursing visit of $12,775 would not be required. And, once again, those are the projected--the projections from the therapists, at Craig Hospital.
 
 
 27
 R.Vol. V at 384-85. Despite Mr. Dahlberg's testimony that his original estimated annual cost for attendant care of $45,619.20 might be based on invalid premises, the district court adopted the original figure without modification.
 
 
 28
 Despite the discrepancies between Mr. Dahlberg's prepared report and his testimony at trial, appellees nevertheless contend that the district court's award is supported by substantial evidence in the record. Appellees emphasize those portions of the record demonstrating that Mr. Heitzenrater had not achieved full independence as of the time of trial. However, the only evidence that appellees point to which even remotely indicates that Mr. Heitzenrater will need attendant care for the rest of his life is the testimony of Ms. Helen Woodard, a rehabilitation expert called as the plaintiffs' witness:
 
 
 29
 Q: So then with a--let's say, a new accessible house, and appropriate training, perhaps at Craig, he should be substantially more functionally independent than he is now?
 
 
 30
 A: That would be what we hope the goal of the program was. Given how far it is post-injury, there are some psychological things that have developed that may make that much more difficult, if not impossible.
 
 
 31
 .............................................................
 
 
 32
 ...................
 
 
 33
 * * *
 
 
 34
 Q: Do you think more probably than not that he will ever achieve full independence this far after the event, even given motivation and--for example, Craig Hospital rehabilitation.
 
 
 35
 A: Probably not.
 
 
 36
 R.Vol. V. at 336, 355-56. Such equivocal testimony simply does not constitute the "substantial evidence" forming a "reasonable probability" of continued dependence to support the district court's conclusion that Mr. Heitzenrater "will be dependent upon the care of others for the remainder of his life." R.Vol. I, Doc. 3 at 7. Accordingly, we reverse the district court's award and remand for further findings by the district court and a recalculation of the appropriate award.
 
 
 37
 C. The Award to Mr. Heitzenrater of $603,557 for Lost Future Earning Capacity
 
 
 38
 The next award of damages appealed by the government is that of $603,557 for Mr. Heitzenrater's loss of future earning capacity. The government argues that because of Mr. Heitzenrater's sporadic work history and his low earned income for the several years preceding the accident, the district court erred in concluding that Mr. Heitzenrater would have achieved parity with other similarly situated workers.
 
 
 39
 In Colorado, as elsewhere, "[in] determining the compensation to be awarded for the impairment of physical capacity and ability to earn, the test to be applied is what the capacity would have been if not interfered with because of the injury proximately caused by the defendant." Brittis v. Freemon, 527 P.2d 1175, 1179 (Colo.Ct.App.1974). Implicit in that determination is an assessment of what the plaintiff's earnings capacity is in light of the injury forming the basis for liability.
 
 
 40
 In this case, the district court's calculations were premised on the following findings:
 
 
 41
 [Mr. Heitzenrater's] chances for future employment are minimal. Uncontroverted evidence at trial showed that only about 10-20% of quadriplegics similar to Rodney are able to either secure or physically withstand employment. Of that number, most have higher levels of education and intelligence than Rodney. It is especially significant that Rodney suffers from dysfunctional use of both hands, especially his right. He is right handed. Based on all the evidence, I find that this disability precludes his performing adequately the skills necessary for clerical, receptionist and other similar positions where manual dexterity is required. I therefore conclude that it is more probable than not that Rodney will not be employable in the future and thus he has sustained a complete loss of earning capacity.
 
 
 42
 R.Vol., Doc. 3 at 19 (emphasis added). After a careful review of the record, we hold that the district court's finding that Mr. Heitzenrater is permanently unemployable, although controverted by some evidence in the record, is not clearly erroneous and must therefore be affirmed. Having accepted the district court's finding of Mr. Heitzenrater's lifelong full employment disability, we must next review the amount of the district court's award for future earnings.
 
 
 43
 The district court awarded Mr. Heitzenrater $603,557 for lost future earnings based on the evidence of Dr. Larry Singell, an economist called as an expert witness by the plaintiffs. Dr. Singell had calculated Mr. Heitzenrater's lost earnings from the time of the accident to the date of trial on the assumption that, had it not been for the accident, Mr. Heitzenrater would have been able to earn only 70% of what an average white male with one to three years of high school education could earn. However, for the purpose of calculating lost future earnings subsequent to trial, Dr. Singell assumed that Mr. Heitzenrater would earn 100% of what an average white male with one to three years of high school would earn. The government maintains this was error because there is no evidence in the record indicating that Mr. Heitzenrater would ever have achieved the full earnings level of a person in that class.
 
 
 44
 In his deposition, Dr. Singell explained that in making his calculation of lost future earnings he took account of Mr. Heitzenrater's past earnings record as well as his education:
 
 
 45
 Now, I mentioned he completed high school and, in fact, had part of a college year but, to be conservative, I used the earnings of high school dropouts....
 
 
 46
 I think reasonable probabilities would say that he would have moved toward having some kind of a job work history. That is, most--95 percent of the males in our society work approximately full-time, that is, they normally experience some unemployment, too, but they--it's typical that the most likely expectation is that he would have moved on to work and, in fact, in most of his adult life he worked and made an income, either in the military or otherwise, so I'm trying to factor in his actual demonstrated history and this pattern in his past to arrive at what, in my judgment, is a reasonable expectation of what he would have earned if he hadn't been injured.
 
 
 47
 .............................................................
 
 
 48
 ...................
 
 
 49
 * * *
 
 
 50
 If you evaluate this from a reasonable economic point of view, it seems likely that Mr. Heitzenrater would have developed into a reasonable worker. Most people do. As I said before, 95 percent or more of white males with a high school diploma, with some college, develop into reasonable workers.
 
 
 51
 Deposition of Dr. Singell at 53-54, 70 (emphasis added).
 
 
 52
 The government challenges Dr. Singell's analysis arguing that "[t]here is no evidence that Mr. Heitzenrater had any college training." Appellant's Reply Br. at 9 n. 5. In their brief, appellees do not suggest that Mr. Heitzenrater ever attended college, or that any evidence was introduced to that effect. We have not found any evidence in the record suggesting Mr. Heitzenrater ever attended college other than the remarks of Dr. Singell. As the above testimony shows, although Dr. Singell at one point indicated that he assumed Mr. Heitzenrater would have established a stable work pattern because 95% of white males with "some college" do so, he had earlier stated that same projection without reference to any college education. Importantly, Dr. Singell's projections used the income levels of white male high school dropouts, even though Mr. Heitzenrater has a high school degree, thus taking into account Mr. Heitzenrater's inconsistent work history. Therefore, we hold that whether or not Dr. Singell's assumption that Mr. Heitzenrater had at some point attended college was correct, the district court's finding that Mr. Heitzenrater's lost future income had a present value of $603,557 based on Dr. Singell's testimony and report is not clearly erroneous.[8]
 
 
 53
 D. The Award to Mrs. Heitzenrater of $215,000 for Future Nighttime Services to Mr. Heitzenrater
 
 
 54
 The district court awarded Mrs. Heitzenrater $215,000 for future nighttime services that she would have to perform on her husband's behalf as a result of the accident (primarily consisting of repositioning him at two-hour intervals during the night to prevent bed sores). The district judge explained that:
 
 
 55
 While I have awarded damages to Rodney Heitzenrater in an amount intended to provide daytime nursing and attendant care in the future so as to relieve Marlinda of this burden, Marlinda will still be expected to provide night-time [sic] attendant care for the remainder of Rodney's life. He requires assistance to change positions in bed, and cannot get out of bed or exit the house in the event of a fire or other emergency. I find that nighttime attendant care is necessary to help ensure Rodney's health and safety. Based on the evidence, I award Marlinda Heitzenrater $4.18 per hour for four hours per night. Based on Dr. Singell's calculations I find that the annual value of this service is $6,100, and that the discounted present value of this care amount equals $215,037.
 
 
 56
 R.Vol. I, Doc. 3 at 22. The government argues, and we agree, that there is absolutely no evidence in the record supporting the district court's conclusion that it would take Mrs. Heitzenrater four hours each evening to assist Mr. Heitzenrater.
 
 
 57
 Appellees point out that Helen M. Woodard, a rehabilitation counselor called as an expert witness by the plaintiffs, testified that without the availability of Mrs. Heitzenrater's assistance, Mr. Heitzenrater would need a night attendant. See R.Vol. IV at 270. Although Ms. Woodard never explicitly testified that she had assumed that a night attendant would be required for eight hours each evening, her calculations were apparently based on that premise.[9] While a hired night attendant might be required for an eight-hour shift to assist Mr. Heitzenrater at two-hour intervals, at no point did Ms. Woodard ever explain why it would take Mrs. Heitzenrater eight hours each evening to reposition her husband in bed. In fact, there was some evidence presented suggesting that Mr. Heitzenrater may only need minimal nighttime assistance. See R.Vol. VI at 445 (testimony of Mrs. Heitzenrater that Mr. Heitzenrater can turn to the right without assistance); Id. at 477 (testimony of Mrs. Heitzenrater that her husband sleeps primarily on his stomach, independently turning himself to his backside and in the early morning hours turning himself from his backside to his right side); R.Vol. III at 140 (testimony of Mr. Heitzenrater that he sleeps on his stomach and needs his wife's assistance with that original transfer).
 
 
 58
 The district judge recognized that Ms. Woodard's estimate was flawed and stated "I question whether [nighttime attendant care] would be necessary for eight hours every night. But I also question whether the $4.18 an hour for the kind of skill she has shown is adequate, so maybe they offset to some extent." R.Vol. VII at 607. In an attempt to modify Ms. Woodard's assumption that eight hours of assistance would be needed nightly, the district court halved the hours and calcualted the damages award on that basis. Although we believe the district court correctly questioned the need for eight hours of Mrs. Heitzenrater's services each evening, we must reverse the court's award because the court's estimate of four hours of assistance each evening is unsupported by any evidence in the record. We therefore reverse the damages award and remand so that the district court may conduct the further proceedings necessary to determine the actual amount of time which will be required of Mrs. Heitzenrater to reposition her husband during the night and recalculate the damages award accordingly.
 
 
 59
 E. The Award of $750,000 to Mrs. Heitzenrater for Loss of Consortium
 
 
 60
 The district court awarded Mrs. Heitzenrater $750,000 for loss of consortium, ruling as follows:
 
 
 61
 Plaintiffs' marriage prior to Rodney's injuries was far from ideal. Rodney had committed infidelity and Marlinda had once filed a petition for divorce. However, since her husband's injuries, Marlinda has shown an intense loyalty and devotion to her husband and the relationship currently appears stable. Both are devoutly religious. Marlinda regularly attends church services three times a week. Moreover, both plaintiffs demonstrate deep affection for their three daughters and solid commitment to their marriage. Thus, I find and conclude that the marriage is secure and likely to be lifelong.
 
 
 62
 Nevertheless, Rodney's injuries and resulting disability have tremendously impacted the marital relationship and have forced Marlinda to assume many onerous, sometimes repulsive, burdens and responsibilities far beyond the scope of a wife's duties in an ordinary marriage. Moreover she has been denied, at a youthful age, most of the joy, benefits, support and security of a normal marital relationship. I therefore award to Marlinda Heitzenrater as reasonable damages for past and future loss of consortium, the amount of $750,000.
 
 
 63
 R.Vol. I, Doc. 3 at 21.
 
 
 64
 In Colorado, damages for non-economic loss of consortium include "damages in the form of loss of affection, society, companionship, and aid and comfort of the injured spouse...." Colorado Jury Instructions-Civil 3d Sec. 6:6(1) (1989). It is evident from this definition that damages for loss of consortium attempt to compensate for the intangible loss of affection.
 
 
 65
 All but one of the considerations relied on by the district court were improper for determining the non-economic damages of Mrs. Heitzenrater under Colorado law. First, the fact that the Heitzenraters have achieved greater marital harmony and been brought closer together as a result of Mr. Heitzenrater's tragic accident, while admirable, is not a proper consideration for measuring what Mrs. Heitzenrater lost as a result of her husband's injuries. Second, the burdens of caring for Mr. Heitzenrater that were imposed on Mrs. Heitzenrater were accounted for elsewhere in the court's damage awards. Mrs. Heitzenrater was compensated for pretrial services on her husband's behalf in that portion of the damage award which the government elected not to appeal. As to the future, the award for future nighttime services by Mrs. Heitzenrater and the award to Mr. Heitzenrater for daytime attendant care, once recalculated on remand, will remove any future uncompensated impositions on Mrs. Heitzenrater. Any award of loss of consortium for those burdens would be a duplicative award.
 
 
 66
 The only factor which the district court should have considered in awarding damages for non-economic loss of consortium is the loss of Mr. Heitzenrater's "affection, society, companionship, aid and comfort" which Mrs. Heitzenrater incurred as a result of her husband's injuries. We believe that when the amount of the award is viewed against that standard, it is evident that the damages award in this case was improper.
 
 
 67
 The district court's characterization of the Heitzenraters' marriage prior to the accident as "far from ideal" understates the seriousness of their marital problems. Six months after the couple was married (approximately two years before the accident), Mrs. Heitzenrater moved in with her brother for four or five days because she learned that her husband had been involved in an extramarital affair. R.Vol. II at 64. Mr. Heitzenrater testified that he had a second affair in June 1982, which again resulted in a separation. Id. at 65. That separation lasted five months, although the two saw one another frequently. Id. It was during that time period that divorce papers were filed and a restraining order was entered against Mr. Heitzenrater in light of his past altercations with Mrs. Heitzenrater's brother. Id. at 66-67. Mr. Heitzenrater testified at trial that in May 1983, two days before he set out on his journey for Colorado, he had been so verbally abusive to his wife that she had become fearful of him and, with the children, moved out of the family's apartment. When asked if he had struck his wife, Mr. Heitzenrater testified "I pushed her out of the way.... I do remember kicking her in the backside and telling her she was no good." R.Vol. II at 96.
 
 
 68
 In light of Mr. Heitzenrater's history of abuse and infidelity, it is clear that his injuries did not deprive Mrs. Heitzenrater of "affection, society, companionship, aid and comfort" so as to justify a $750,000 award for loss of consortium. See Gelinas v. Mackey, 465 A.2d 498, 501 (N.H.1983) (where couple had been separated at the time of trial, "[t]he jury might have concluded that their relationship was so strained or non-existent [sic] at the time of the collision as to justify a zero verdict on the issue of loss of consortium").[10] Accordingly, we modify the award down to an amount of $100,000.
 
 CONCLUSION
 
 69
 We REVERSE the award of $2,000,000 to Mr. Heitzenrater for pain and suffering and MODIFY the award to $1,000,000. We AFFIRM the award to Mr. Heitzenrater for future lost income. We REVERSE the district court's award of $750,000 to Mrs. Heitzenrater for loss of consortium and MODIFY the award to $100,000. We REVERSE the award to Mr. Heitzenrater for future attendant care and the award to Mrs. Heitzenrater for future nighttime services and order that these damage claims be REMANDED for further proceedings consistent with this order.
 
 
 
 *
 Honorable David Sam, United States District Judge for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Recently, the Colorado Supreme Court affirmed a $5,000,000 jury verdict in favor of a plaintiff who was rendered a quadriplegic as a result of a skiing accident. Aspen Skiing Company v. Peer, No. 895C548, slip op. (Colo. filed Jan 14, 1991). However, we have no way of knowing what percent of the award was attributable to pain and suffering. Further, the court never addressed the issue of whether the award was excessive
 The reported cases involving awards for injuries causing paraplegia are equally scant. See e.g., United States Steel v. Warner, 378 F.2d 995 (10th Cir.1967) ($160,000 awarded to paraplegic for all damages including pain and suffering); Hampton v. State Comm., 209 Kan. 565, 498 P.2d 236 (1972) ($450,000 awarded to paraplegic without specifying what portion was for pain and suffering).
 
 
 [2]
 Appellees point to the decision of the Colorado Court of Appeals in Whitlock v. University of Denver, 712 P.2d 1072, 1077 (Colo.Ct.App.1985) (improper for district court to remit jury verdict of $7.3 million dollars in favor of quadriplegic to $4 million dollars), rev'd on other grounds, 744 P.2d 54 (Colo.1987). However, because that decision was reversed, it is without precedential effect
 
 
 [3]
 In Rawson v. Sears Roebuck & Co., 615 F.Supp. 1546 (D.Colo.1985), rev'd on other grounds, 822 F.2d 908 (10th Cir.1987), cert. denied, 484 U.S. 1006 (1988), the federal district court awarded plaintiff nineteen million dollars for pain and suffering under a Colorado wrongful discharge statute and noted that the defendant's brief cited "two recent Colorado district court cases awarding quadriplegic plaintiffs $4,900,000 and $4,100,000 for pain and suffering, loss of income, and medical expenses." Id. at 1548. We cannot consider those verdicts in our review of the award in this case because there is no way of determining what portion of the award was for pain or suffering or whether the verdicts were sustained on appeal. Moreover, we do not consider the verdict in the Rawson case because that decision was reversed on appeal
 Of the Tenth Circuit cases cited by appellees, only two involve awards for pain and suffering in excess of $1 million dollars which were upheld on appeal. See Miller, 901 F.2d at 897 ($1.5 million dollar award for pain and suffering of a brain-damaged teenager in an Oklahoma FTCA action sustained); Blevins v. Cessna Aircraft Co., 728 F.2d 1576, 1579 (10th Cir.), cert. dismissed, 468 U.S. 1228 (1984) (Wyoming jury verdict for $1.3 million dollars to a plaintiff injured in an airplane crash did not shock the judicial conscience). However, neither of those cases arose in Colorado nor involved injuries similar to Mr. Heitzenrater's.
 
 
 [4]
 Garcia was decided under the Colorado damages limitation statute, Colo.Rev.Stat. Sec. 13-21-102.5(3)(a), which places a $500,000 limit on pain and suffering awards where the plaintiff proves his damages by clear and convincing evidence. However, the damages awarded by the district court fell $200,000 below the statutory ceiling
 
 
 [5]
 See Appellant's Br. at 13, n. 8 (conceding that because this action was filed before the statute was adopted, it is not controlling)
 
 
 [6]
 Appellees' attempt to portray the $2,000,000 award as a mere $40,000 per year compensation to Mr. Heitzenrater over the estimated remaining forty-nine years of his life simply ignores the present value of that award. If Mr. Heitzenrater were to invest the $2,000,000 award, even a modest seven percent return would generate $140,000 of income a year, while leaving the principal unaffected. Employing those same conservative calculations, our modification of the award to $1,000,000 will generate $70,000 a year for Mr. Heitzenrater without requiring him to invade principal. In addition, of course, Mr. Heitzenrater has received other awards in excess of $2,000,000 which are final because the government did not appeal as to them; he and his wife will receive other awards in excess of $700,000 which we are affirming on this appeal; and he has the potential for still further awards as several claims are being remanded to the district court for further consideration
 
 
 [7]
 We have determined that remanding the calculation of the pain and suffering award back to the district court would not serve the interests of justice or the best interests of the parties. See Felder, 543 F.2d at 671; Drayton v. Jiffee Chemical Corp., 591 F.2d 352, 367 (6th Cir.1978). Therefore, we exercise our power under 28 U.S.C. Sec. 2106 and set the award at one-million dollars
 
 
 [8]
 Dr. Singell's report estimated Mr. Heitzenrater's lost future earnings as $505,800 and his loss of future benefits as 101,400. See Plaintiff's Ex. 10. Although the district court purported to rely on Dr. Singell's report, the court concluded that the amount Mr. Heitzenrater's lost future earnings was $502,765 and that his lost future fringe benefits were valued at $100,792. See R.Vol. I, Doc. 3 at 20. Although the reason for this small discrepancy is unclear, we need not address the question as neither party challenges it on appeal
 
 
 [9]
 In her report, Ms. Woodard calculated the annual cost of such care at $12,200 per year at $4.18 an hour ($4.18 X 8 hrs. X 365 days = $12,200). See Plaintiffs' Exhibit 11
 
 
 [10]
 We would reverse this award for loss of consortium even if there were other Colorado cases in which comparably sized awards were upheld. However, we are especially persuaded that reversal is warranted here in light of the government's assertion that this award is the single largest damage award for loss of consortium under Colorado law. Appellees do not direct our attention to any published opinions to the contrary, and we have found none in our research. See, e.g., Schell v. Navajo Freight Lines, Inc., 693 P.2d 382, 384 (Colo.Ct.App.1984) (award of $48,550 for loss of consortium); Garcia v. United States, 697 F.Supp. 1570, 1576 (D.Colo.1988) (award of $150,000 for loss of consortium); Mays v. United States, 608 F.Supp. 1476, 1483 (D.Colo.1985) (award of $36,000 for loss of consortium), rev'd on other grounds, 806 F.2d 976 (10th Cir.1986), cert. denied, 482 U.S. 913 (1987)